03-2257-068879116-9

connection with any damage to such property, resulting from any cause or causes whatsoever, including but not limited to, land subsidence, landslide, windstorm, earthquake, fire, flood or any other cause.

Borrower agrees to execute, acknowledge if requested, and deliver to Lender, and/or upon notice from Lender shall request any insurance agency or company that has issued any insurance policy to execute and deliver to Lender, any additional instruments or documents requested by Lender from time to time to evidence Borrower's absolute and irrevocable assignments set forth in this paragraph.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, or remove or demolish any building thereon, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in good condition and repair in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property in good and workmanlike manner if damaged to avoid further

CALIFORNIA
32839 (05-01)

Page 7 of 17

03-2257-068879116-9

deterioration or damage. Lender shall, unless otherwise agreed in writing between Lender and Borrower, have the right to hold insurance or condemnation proceeds. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause. Lender does not make any warranty or representation regarding, and assumes no responsibility for, the work done on the Property, and Borrower shall not have any right to rely in any way on any inspection(s) by or for Lender or its agent. Borrower shall be solely responsible for determining that the work is done in a good, thorough, efficient and workmanlike manner in accordance with all applicable laws.

Borrower shall (a) appear in and defend any action or proceeding purporting to affect the security hereof, the Property or the rights or powers of Lender or Trustee; (b) at Lender's option, assign to Lender, to the extent of Lender's interest, any claims, demands, or causes of action of any kind, and any award, court judgement, or proceeds of settlement of any such claim, demand or cause of action of any kind which Borrower now has or may hereafter acquire arising out of or relating to any interest in the acquisition or ownership of the Property. Lender and Trustee shall not have any duty to prosecute any such claim, demand or cause of action. Without limiting the foregoing, any such claim, demand or cause of action arising out of or relating to any interest in the acquisition or ownership of the Property may include (i) any such injury or damage to the Property including without limit injury or damage to any structure or improvement situated thereon, (ii) or any claim or cause of action in favor of Borrower which arises out of the transaction financed in whole or in part by the making of the loan secured hereby, (iii) any claim or cause of action in favor of Borrower (except for bodily injury) which arises as a result of any negligent or improper construction, installation or repair of the Property including without limit, any surface or subsurface thereof, or of any building or structure thereon or (iv) any proceeds of insurance, whether or not required by Lender, payable as a result of any damage to or otherwise relating to the Property or any interest therein. Lender may apply, use or release such monies so received by it in the same manner as provided in Paragraph 5 for the proceeds of insurance.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting

CALIFORNIA
32838 (05-01)

Page 8 of 17

03-2257-068879116-9

and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage

CALIFORNIA
32838 (05-01)

03-2257-068879116-9

insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is

CALIFORNIA
32838 (05-01)

03-2257-068879116-9

less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgement, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgement, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** This Security Instrument cannot be changed or modified except as otherwise provided herein or by agreement in writing signed by Borrower, or any Successor in interest to Borrower and Lender. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successor in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy. No waiver by Lender of any right under this Security Instrument shall be effective unless in writing. Waiver by Lender of any right granted to Lender under this Security Instrument or of any provision of this Security Instrument as to any transaction or occurrence shall not be deemed a waiver as to any future transaction or occurrence.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by

CALIFORNIA
32838 (05-01)

03-2257-068879116-9

Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Borrower shall pay such other charges as Lender may deem reasonable for services rendered by Lender and furnished at the request of Borrower, any Successor in interest to Borrower or any agent of Borrower. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note.) Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the

03-2257-068879116-9

conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgement enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument,

CALIFORNIA
32838 (05-01)

03-2257-068879116-9

and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substance in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use, or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

CALIFORNIA
32838 (05-01)                    Page 14 of 17

03-2257-068879116-9

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. If Borrower or any successor in interest to Borrower files (or has filed against Borrower or any successor in interest to Borrower) a bankruptcy petition under Title II or any successor title of the United States Code which provides for the curing of prepetition default due on the Note, interest at a rate determined by the Court shall be paid to Lender on post-petition arrears.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the of the occurrence of and event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender or the Trustee (whether or not the Trustee is affiliated with Lender) may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

CALIFORNIA
32838 (05 01)

Page 15 of 17

03-2257-068879116-9

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution. Trustee may destroy the Note and the Security Instrument three (3) years after issuance of a full reconveyance or release (unless directed in such request to retain them).

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

X _____
LOUIS J JEAN-LOUIS

X _____
SYLVIA L JEAN-LOUIS

CALIFORNIA
32836 (05-01)

03-2257-068879116-9

——————————— (Space Below This Line For Acknowledgment) ———————————

State of CALIFORNIA          )
                             ) SS.
County of RIVERSIDE          )

On APR 5, 2005 _____, before me, R.P. SALAZAR NOTARY PUBLIC
                                    , a Notary Public in and for the State of
California, personally appeared   LOUIS J. JEAN-LOUIS
                                  SYLVIA L. JEAN-LOUIS

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal

Signature _____

Notary Public in and for the State of California

R. D. SALAZAR
Commission # 1465444
Notary Public - California
Los Angeles County
My Comm. Expires Feb 4, 2008

**ADJUSTABLE RATE RIDER**
**(12-MTA Index - Payment and Rate Caps)**

03-2257-068879116-9

THIS ADJUSTABLE RATE RIDER is made this __5th__ day of __April, 2005__ ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned
(the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
__Washington Mutual Bank, FA__ (the "Lender") of the same date and
covering the property described in the Security Instrument and located at:

__14229 ASHTON LANE, RIVERSIDE, CA 92508__
(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST
RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL
HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY
BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE
THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __945,000.00__ ).
MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND
RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    Interest will be charged on unpaid Principal until the full amount of Principal has been paid.
Up until the first day of the calendar month that immediately precedes the first payment due date
set forth in Section 3 of the Note, I will pay interest at a yearly rate of __4.811__ %. Thereafter
until the first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate
of __1.250__ %. The interest rate I will pay will thereafter change in accordance with Section 4
of the Note.
    Section 4 of the Note provides for changes in the interest rate and monthly payment as
follows:

32843 (11-01)                              Page 1 of 5

03-2257-068879116-9

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the _____1st_____ day of ____June, 2005____, and on that day every month thereafter. Each such day is called a "Change Date".

### (B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Interest Rate Change

Before each Change Date, the Note Holder will calculate my new interest rate by adding ____Two & Sixty-Four-Hundredths____ percentage points _2.640_ % ("Margin") to Current Index. The Note Holder will then round the result of this addition to the nearest one thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). The difference will be rounded to the next higher 1/8 of 1%.

### (D) Interest Rate Limit

My interest rate will never be greater than _10.050_ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

### (E) Payment Change Dates

Effective every year commencing ____June 1, 2006____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the

03-2257-068879116-9

amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to ___125%___ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that ___125%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my

32843 (11-01)                          Page 3 of 5

03-2257-068879116-9

monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement , the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the

32843 (11-01)

Page 4 of 5

03-2257-068879116-9

transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

X _____
LOUIS J JEAN LOUIS

X _____
SYLVIA L JEAN LOUIS

32843 (11-01)                          Page 5 of 6

EXHIBIT 3

*SEC Info*    <u>Home</u>    <u>Search</u>    <u>My Interests</u>    <u>Help</u>    <u>User Info</u>    *<u>Lawrence Asuncion</u>*

## <u>WaMu Mortgage Pass-Through Certificates, Series 2005-AR11</u> · 8-K · For 8/25/05 · EX-4.1

Filed On <u>9/9/05</u>, 2:10pm ET   ·   Accession Number 1277277-5-722   ·   SEC File <u>333-103345-73</u>

[ Find ]  [                    ]  in  [ this entire Filing. ÷ ]  Show  [ Docs searched ÷ ]  and  [ every "hit". ÷ ]
<u>Help...</u>   *Wildcards:* **?** (any letter), **\*** (many). *Logic:* for Docs: **&** (<u>and</u>), **|** (or); for Text: **|** (<u>anywhere</u>), "(&)" (near).

| <u>As Of</u> | <u>Filer</u> | <u>Filing</u> | <u>For/On/As</u> | <u>Docs:Size</u> | <u>Issuer</u> | <u>Agent</u> |
|---|---|---|---|---|---|---|
| 9/09/05 | <u>WaMu Mtge Pass-Through..2005-AR11</u> **8-K:9** | <u>8/25/05</u> | 3:2.7M | | | <u>Kelly Cecelia Anne/FA</u> |

Current Report  —  Form 8-K
Filing Table of Contents

| <u>Document/Exhibit</u> | <u>Description</u> | <u>Pages</u> | <u>Size</u> |
|---|---|---|---|
| 1: <u>8-K</u> | Current Report | HTML | 14K |
| 2: <u>EX-4.1</u> | Instrument Defining the Rights of Security Holders | HTML | 1.24M |
| 3: <u>EX-4.1</u> | Instrument Defining the Rights of Security Holders -- psa2005_ar11 | PDF | 913K |

**EX-4.1  —  Instrument Defining the Rights of Security Holders**

*This exhibit is an HTML Document rendered as filed.  [ <u>Alternative Formats</u> ]*

### <u>$6.95 Trades. $100 Bonus</u>

www.ShareBuilder.com

No Minimum to Open Your Account ShareBuilder by Capital One

[ ➡ ]

AdChoices ▷

**<u>Click here for printer-friendly pdf version of this document with page breaks as indicated in the Table of Contents</u>**

*If above link does not activate, you will find the duplicate printer-friendly pdf version of this document attached to this filing submission with the SEC.*

EXHIBIT <u>4.1</u>

**EXECUTION VERSION**

WASHINGTON MUTUAL MORTGAGE SECURITIES CORP.,

as Depositor

and

WASHINGTON MUTUAL BANK
as Servicer

and

<u>DEUTSCHE BANK NATIONAL TRUST COMPANY</u>,

as Trustee

and

DEUTSCHE BANK TRUST COMPANY DELAWARE,

as Delaware Trustee


POOLING AND SERVICING AGREEMENT

$3,201,069,294.58

Washington Mutual Mortgage Securities Corp.

WaMu Mortgage Pass-Through Certificates

Series 2005-AR11

Cut-Off Date: August 1, 2005


## TABLE OF CONTENTS

| | Page |
|---|---|
| **ARTICLE I** | 7 |
| Section 1.01 Definitions | 7 |
| Adjusted Cap Rate | 7 |
| Adjusted Weighted Average Pass-Through Rate | 8 |
| Aggregate Certificate Principal Balance | 8 |
| Appraised Value | 8 |
| Assigned Prepayment Premiums | 8 |
| Assignment of Proprietary Lease | 8 |
| Authenticating Agent | 8 |
| Authorized Denomination | 8 |
| Bankruptcy Loss | 9 |
| Beneficial Holder | 9 |
| Benefit Plan Opinion | 9 |
| Book-Entry Certificates | 9 |
| BSFP | 9 |
| Business Day | 9 |
| Buydown Agreement | 9 |
| Buydown Fund | 9 |
| Buydown Fund Account | 10 |
| Buydown Loan | 10 |
| Cap Counterparty | 10 |
| Cap Strike Rate | 10 |
| Carry-Forward Subsequent Recoveries Amount | 10 |
| Carryover Shortfall Amount | 10 |
| Carryover Shortfall Payment | 10 |
| Certificate | 12 |
| Certificate Account | 12 |
| Certificateholder or Holder | 13 |
| Certificate Interest Rate | 13 |
| Certificate of Trust | 13 |
| Certificate Principal Balance | 13 |
| Certificate Register and Certificate Registrar | 13 |
| Class | 13 |
| Class A Certificates | 14 |
| Class A-L Regular Interests | 14 |
| Class A-1A Certificates | 14 |
| Class A-1A-L Regular Interest | 14 |
| Class A-1B1 Certificates | 14 |
| Class A-1B1-L Regular Interest | 14 |
| Class A-1B2 Certificates | 14 |
| Class A-1B2-L Regular Interest | 14 |
| Class A-1B3 Certificates | 14 |
| Class A-1B3-L Regular Interest | 15 |
| Class A-1C1 Certificates | 15 |
| Class A-1C1-L Regular Interest | 15 |
| Class A-1C2 Certificates | 15 |
| Class A-1C2-L Regular Interest | 15 |
| Class A-1C3 Certificates | 15 |
| Class A-1C3-L Regular Interest | 15 |
| Class A-1C4 Certificates | 15 |
| Class A-1C4-L Regular Interest | 15 |
| Class B Certificates | 15 |
| Class B-1 Certificates | 15 |
| Class B-L Regular Interests | 15 |
| Class B-1-L Regular Interest | 15 |
| Class B-2 Certificates | 16 |
| Class B-2-L Regular Interest | 16 |
| Class B-3 Certificates | 16 |
| Class B-3-L Regular Interest | 16 |
| Class B-4 Certificates | 16 |
| Class B-4-L Regular Interest | 16 |
| Class B-5 Certificates | 16 |
| Class B-5-L Regular Interest | 16 |
| Class B-6 Certificates | 16 |
| Class B-6-L Regular Interest | 16 |
| Class B-7 Certificates | 16 |

| | |
|---|---|
| Class B-7-L Regular Interest | 16 |
| Class B-8 Certificates | 16 |
| Class B-8-L Regular Interest | 16 |
| Class B-9 Certificates | 17 |
| Class B-9-L Regular Interest | 17 |
| Class B-10 Certificates | 17 |
| Class B-10-L Regular Interest | 17 |
| Class B-11 Certificates | 17 |
| Class B-11-L Regular Interest | 17 |
| Class B-12 Certificates | 17 |
| Class B-12-L Regular Interest | 17 |
| Class B-13 Certificates | 17 |
| Class B-13-L Regular Interest | 17 |
| Class LT Principal Reduction Amounts | 17 |
| Class LT Regular Interests | 17 |
| Class LT1 Regular Interest | 17 |
| Class LT2 Principal Distribution Amount | 18 |
| Class LT2 Regular Interest | 18 |
| Class LT3 Principal Distribution Amount | 18 |
| Class LT3 Regular Interest | 18 |
| Class LT4 Principal Distribution Amount | 18 |
| Class LT4 Regular Interest | 18 |
| Class Notional Amount | 18 |
| Class PPP Certificates | 18 |
| Class Principal Balance | 18 |
| Class R Certificates | 19 |
| Class R Residual Interests | 19 |
| Class R-1 Residual Interest | 19 |
| Class R-2 Residual Interest | 19 |
| Class X Certificates | 19 |
| Class X-L Notional Amount | 20 |
| Class X-L Regular Interest | 20 |
| Class X PO Component | 20 |
| Clean-Up Call Option Date | 20 |
| Clean-Up Call Percentage | 20 |
| Clearing Agency | 20 |
| Closing Date | 20 |
| Closing Date Loan-to-Value Ratio | 20 |
| Code | 20 |
| Company | 20 |
| Compensating Interest | 20 |
| Cooperative | 20 |
| Cooperative Apartment | 21 |
| Cooperative Lease | 21 |
| Cooperative Loans | 21 |
| Cooperative Stock | 21 |
| Cooperative Stock Certificate | 21 |
| Corporate Trust Office | 21 |
| Corporation | 21 |
| Corresponding Class | 21 |
| Credit Support Depletion Date | 22 |
| Cumulative Carry-Forward Subsequent Recoveries Amount | 22 |
| Curtailment | 22 |
| Curtailment Shortfall | 22 |
| Custodial Account for P&I | 22 |
| Custodial Account for Reserves | 23 |
| Custodial Agreement | 23 |
| Custodian | 23 |
| Cut-Off Date | 23 |
| Definitive Certificates | 23 |
| Delaware Trustee | 23 |
| Depositary Agreement | 24 |
| Destroyed Mortgage Note | 24 |
| Determination Date | 24 |
| Disqualified Organization | 24 |
| Distribution Date | 24 |
| DTC | 24 |
| DTC Participant | 24 |
| Due Date | 24 |
| Eligible Institution | 24 |
| Eligible Investments | 25 |
| ERISA | 26 |
| ERISA Restricted Certificate | 26 |
| Event of Default | 26 |
| Excess Liquidation Proceeds | 26 |
| Excess Subsequent Recoveries | 26 |
| Fannie Mae | 26 |
| FDIC | 26 |
| FHA | 26 |
| Final Maturity Date | 26 |
| Final Yield Maintenance Payment Date | 26 |
| Fitch: | 27 |
| Freddie Mac | 27 |
| Index | 27 |
| Indirect DTC Participants | 27 |
| Initial Custodial Agreement | 27 |
| Initial Custodian | 27 |
| Insurance Proceeds | 27 |
| Interest Distribution Amount | 27 |
| Interest Rate Adjustment Date | 28 |
| Investment Account | 28 |
| Investment Depository | 28 |
| Junior Subordinate Certificates | 28 |
| Last Scheduled Distribution Date | 28 |
| Lender | 28 |
| LIBOR | 28 |
| LIBOR Determination Date | 28 |
| Liquidated Mortgage Loan | 28 |
| Liquidation Principal | 28 |
| Liquidation Proceeds | 28 |

| | |
|---|---|
| Loan-to-Value Ratio | 28 |
| Lowest Class B Owner | 29 |
| Marker Rate | 29 |
| MERS | 29 |
| MERS Loan | 29 |
| MERS® System | 29 |
| MIN | 29 |
| MOM Loan | 29 |
| Minimum Monthly Payment | 29 |
| Monthly P&I Advance | 29 |
| Monthly Payment Adjustment Terms | 29 |
| Moody's | 29 |
| Mortgage | 29 |
| Mortgage File | 29 |
| Mortgage Interest Rate | 32 |
| Mortgage Loan Margin | 32 |
| Mortgage Loan Schedule | 32 |
| Mortgage Loans | 33 |
| Mortgage Note | 33 |
| Mortgage Pool | 33 |
| Mortgage Pool Assets | 33 |
| Mortgaged Property | 34 |
| Mortgagor | 34 |
| Negative Amortization Amount | 34 |
| Net Negative Amortization Amount | 34 |
| No-Delay Accrual Period | 35 |
| Nonrecoverable Advance | 35 |
| Non-U.S. Person | 35 |
| Notice Addresses | 35 |
| OTS | 35 |
| Officer's Certificate | 35 |
| One-Year MTA | 35 |
| Opinion of Counsel | 35 |
| Original Trust Agreement | 36 |
| Original Value | 36 |
| Ownership Interest | 36 |
| Pass-Through Entity | 36 |
| Pass-Through Rate | 36 |
| Paying Agent | 36 |
| Payoff | 36 |
| Payoff Earnings | 36 |
| Payoff Interest | 37 |
| Payoff Period | 37 |
| Percentage Interest | 37 |
| Permitted Transferee | 37 |
| Person | 38 |
| Prepaid Monthly Payment | 38 |
| Prepayment Premium | 38 |
| Primary Insurance Policy | 38 |
| Principal Balance | 38 |
| Principal Payment | 39 |
| Principal Payment Amount | 39 |
| Principal Prepayment | 39 |
| Principal Prepayment Amount | 39 |
| Prior Period | 39 |
| Pro Rata Allocation | 39 |
| Prospectus | 40 |
| Purchase Obligation | 40 |
| Purchase Price | 40 |
| Qualified Insurer | 40 |
| Rate Ceiling | 40 |
| Rating Agency | 40 |
| Ratings | 40 |
| Realized Loss | 40 |
| Recognition Agreement | 43 |
| Record Date | 43 |
| Reference Banks | 43 |
| Regular Interests | 43 |
| Relief Act Shortfall | 43 |
| REMIC | 44 |
| REMIC Provisions | 44 |
| REMIC I | 44 |
| REMIC I Assets | 44 |
| REMIC I Available Distribution Amount | 44 |
| REMIC I Distribution Amount | 45 |
| REMIC I Principal Distribution Amount | 46 |
| REMIC I Regular Interests | 46 |
| REMIC II | 46 |
| REMIC II Assets | 46 |
| REMIC II Available Distribution Amount | 46 |
| REMIC II Distribution Amount | 46 |
| REMIC II Regular Interests | 52 |
| Residual Certificates | 52 |
| Residual Distribution Amount | 52 |
| Responsible Officer | 52 |
| ROV Mortgage Loan | 52 |
| S&P | 52 |
| Secretary of State | 52 |
| Securities Act | 53 |
| Security Agreement | 53 |
| Senior Certificates | 53 |
| Senior Liquidation Amount | 53 |
| Senior Percentage | 53 |
| Senior Prepayment Percentage | 53 |
| Senior Principal Distribution Amount | 55 |
| Senior Subordinate Certificates | 55 |
| Servicer | 55 |
| Servicer Business Day | 55 |
| Servicing Fee | 55 |
| Servicing Fee Rate | 55 |

| | |
|---|---|
| Servicing Officer | 55 |
| Special Primary Insurance Policy | 55 |
| Special Primary Insurance Premium | 56 |
| Statutory Trust Statute | 56 |
| Streamlined Mortgage Loan | 56 |
| Subordinate Certificates | 56 |
| Subordinate Liquidation Amount | 56 |
| Subordinate Percentage | 56 |
| Subordinate Prepayment Percentage | 56 |
| Subordinate Principal Distribution Amount | 56 |
| Subordinate Principal Prepayments Distribution Amount | 56 |
| Subordination Level | 57 |
| Subsequent Recoveries | 57 |
| Substitute Mortgage Loan | 57 |
| Tax Matters Person | 57 |
| Termination Date | 57 |
| Termination Payment | 57 |
| Transfer | 57 |
| Transferee | 57 |
| Transferee Affidavit and Agreement | 58 |
| Trust | 58 |
| Trustee | 58 |
| Uncollected Interest | 58 |
| Uncompensated Interest Shortfall | 58 |
| Underwriters | 58 |
| Underwriting Standards | 58 |
| Uninsured Cause | 58 |
| U.S. Person | 58 |
| VA | 58 |
| Weighted Average Pass-Through Rate | 59 |
| Withdrawal Date | 59 |
| Yield Maintenance Account | 59 |
| Yield Maintenance Agreement | 59 |
| Yield Maintenance Available Payment Amount | 59 |
| Yield Maintenance Notional Balance | 59 |
| Yield Maintenance Payment | 59 |
| ARTICLE II  Creation of the Trust; Conveyance of the Mortgage Pool Assets, REMIC I Regular Interests and REMIC II Regular Interests; REMIC Election and Designations; Original Issuance of Certificates | 60 |
| Section 2.01 Creation of the Trust | 60 |
| Section 2.02 Restrictions on Activities of the Trust | 61 |
| Section 2.03 Separateness Requirements | 61 |
| Section 2.04 Conveyance of Mortgage Pool Assets; Security Interest | 63 |
| Section 2.05 Delivery of Mortgage Files | 64 |
| Section 2.06 REMIC Election for REMIC I | 66 |
| Section 2.07 Acceptance by Trustee | 67 |
| Section 2.08 Representations and Warranties of the Company Concerning the Mortgage Loans | 69 |
| Section 2.09 Acknowledgment of Transfer of Mortgage Pool Assets | 74 |
| Section 2.10 Conveyance of REMIC II Assets; Security Interest | 74 |
| Section 2.11 REMIC Election for REMIC II | 75 |
| Section 2.12 Acknowledgement of Transfer of REMIC II Assets; Authentication of Certificates | 77 |
| Section 2.13 Legal Title | 77 |
| Section 2.14 Compliance with ERISA Requirements | 77 |
| Section 2.15 Additional Representation of the Company Concerning the Mortgage Loans | 77 |
| Section 2.16 Distributions to Class A Certificates and the Class B Certificates Outside of REMIC II | 78 |
| ARTICLE III  Administration and Servicing of Mortgage Loans | 78 |
| Section 3.01 The Servicer | 78 |
| Section 3.02 Custodial Accounts and Buydown Fund Accounts | 80 |
| Section 3.03 The Investment Account; Eligible Investments | 81 |
| Section 3.04 The Certificate Account | 82 |
| Section 3.05 Permitted Withdrawals from the Certificate Account, the Investment Account, Custodial Accounts for P&I and Custodial Accounts for Reserves and of Buydown Funds from the Buydown Fund Accounts | 83 |
| Section 3.06 Maintenance of Primary Insurance Policies; Collections Thereunder | 84 |
| Section 3.07 Maintenance of Hazard Insurance | 85 |
| Section 3.08 Enforcement of Due-on-Sale Clauses; Assumption Agreements | 85 |
| Section 3.09 Realization Upon Defaulted Mortgage Loans | 86 |
| Section 3.10 Trustee to Cooperate; Release of Mortgage Files | 88 |
| Section 3.11 Compensation to the Servicer | 89 |
| Section 3.12 Reports to the Trustee; Certificate Account Statement | 89 |
| Section 3.13 Annual Statement as to Compliance | 89 |
| Section 3.14 Access to Certain Documentation and Information Regarding the Mortgage Loans | 89 |
| Section 3.15 Annual Independent Public Accountants' Servicing Report | 90 |
| Section 3.16 Yield Maintenance Account | 90 |
| Section 3.17 [Reserved.] | 91 |
| Section 3.18 [Reserved.] | 91 |
| Section 3.19 Determination of LIBOR by Servicer 91 | |
| Section 3.20 Assigned Prepayment Premiums 92 | |
| ARTICLE IV  Payments to Certificateholders; Payment of Expenses | 94 |
| Section 4.01 Distributions to Holders of REMIC I Regular Interests and Class R-1 Residual Interest | 94 |
| Section 4.02 Advances by the Servicer; Distribution Reports to the Trustee | 94 |
| Section 4.03 Nonrecoverable Advances | 95 |
| Section 4.04 Distributions to Certificateholders; Payment of Special Primary Insurance Premiums | 95 |
| Section 4.05 Statements to Certificateholders | 97 |
| ARTICLE V  The Certificates | 98 |
| Section 5.01 The Certificates | 98 |
| Section 5.02 Certificates Issuable in Classes; Distributions of Principal and Interest; Authorized Denominations | 104 |
| Section 5.03 Registration of Transfer and Exchange of Certificates | 104 |
| Section 5.04 Mutilated, Destroyed, Lost or Stolen Certificates | 105 |
| Section 5.05 Persons Deemed Owners | 105 |
| Section 5.06 Temporary Certificates | 106 |
| Section 5.07 Book-Entry for Book-Entry Certificates | 106 |
| Section 5.08 Notices to Clearing Agency | 107 |
| Section 5.09 Definitive Certificates | 107 |
| Section 5.10 Office for Transfer of Certificates | 108 |
| Section 5.11 Nature of Certificates | 108 |
| ARTICLE VI  The Company and the Servicer | 108 |
| Section 6.01 Liability of the Company and the Servicer | 108 |
| Section 6.02 Merger or Consolidation of the Company, or the Servicer | 108 |
| Section 6.03 Limitation on Liability of the Company, the Servicer and Others | 109 |
| Section 6.04 Neither the Company nor the Servicer May Resign | 109 |
| Section 6.05 Trustee Access 110 | |

| | |
|---|---|
| **ARTICLE VII  Default** | 110 |
| Section 7.01 Events of Default | 110 |
| Section 7.02 Trustee to Act; Appointment of Successor | 112 |
| Section 7.03 Notification to Certificateholders | 113 |
| **ARTICLE VIII  Concerning the Trustees** | 114 |
| Section 8.01 Duties of Trustees | 114 |
| Section 8.02 Certain Matters Affecting the Trustees | 115 |
| Section 8.03 Trustees Not Liable for Certificates or Mortgage Loans | 116 |
| Section 8.04 Trustees May Own Certificates | 116 |
| Section 8.05 The Servicer to Pay Trustees' Fees and Expenses | 117 |
| Section 8.06 Eligibility Requirements for Trustees | 117 |
| Section 8.07 Resignation and Removal of Trustees | 117 |
| Section 8.08 Successor Trustee | 118 |
| Section 8.09 Merger or Consolidation of Trustee | 118 |
| Section 8.10 Appointment of Co-Trustee or Separate Trustee | 119 |
| Section 8.11 Authenticating Agents | 120 |
| Section 8.12 Paying Agents | 121 |
| Section 8.13 Duties of Delaware Trustee | 121 |
| Section 8.14 Amendment to Certificate of Trust | 122 |
| Section 8.15 Yield Maintenance Agreement | 122 |
| **ARTICLE IX  Termination** | 122 |
| Section 9.01 Termination Upon Purchase by the Servicer or Liquidation of All Mortgage Loans | 122 |
| Section 9.02 Additional Termination Requirements | 124 |
| Section 9.03 Trust Irrevocable | 125 |
| **ARTICLE X  Miscellaneous Provisions** | 125 |
| Section 10.01 Amendment | 125 |
| Section 10.02 Recordation of Agreement | 127 |
| Section 10.03 Limitation on Rights of Certificateholders | 127 |
| Section 10.04 Access to List of Certificateholders | 128 |
| Section 10.05 Governing Law | 128 |
| Section 10.06 Notices | 128 |
| Section 10.07 Severability of Provisions | 129 |
| Section 10.08 Counterpart Signatures | 129 |
| Section 10.09 Benefits of Agreement | 129 |
| Section 10.10 Notices and Copies to Rating Agencies | 129 |

| | |
|---|---|
| Exhibit A | Form of Certificates (other than Class R Certificates) |
| Exhibit B | Form of Class R Certificates |
| Exhibit C | Anti-Predatory Lending Categorization |
| Exhibit D | Mortgage Loan Schedule |
| Exhibit E | Selling And Servicing Contract |
| Exhibit F | Form of Transferor Certificate For Junior Subordinate Certificates |
| Exhibit G | Form of Transferee's Agreement For Junior Subordinate Certificates |
| Exhibit H | Form of Additional Matter Incorporated Into The Certificates |
| Exhibit I | Transferor Certificate |
| Exhibit J | Transferee Affidavit And Agreement |
| Exhibit K | [Reserved] |
| Exhibit L | Form of Investment Letter |
| Exhibit M | Form of Trustee's Certification Pursuant to Section 2.07 |
| Exhibit N | Officer's Certificate With Respect to ERISA Matters Pursuant to Section 5.01(d) |
| Exhibit O | Officer's Certificate With Respect to ERISA Matters Pursuant to Section 5.01(g) |

This Pooling and Servicing Agreement, dated and effective as of August 1, 2005 (this "Agreement"), is executed by and among Washington Mutual Mortgage Securities Corp., as depositor (the "Company"), Washington Mutual Bank, as Servicer (the "Servicer"), Deutsche Bank National Trust Company, a national banking association with a corporate trust office at 1761 East St. Andrew Place, Santa Ana, CA 92705, as Trustee (the "Trustee"), and Deutsche Bank Trust Company Delaware, as Delaware Trustee (the "Delaware Trustee"). Capitalized terms used in this Agreement and not otherwise defined have the meanings ascribed to such terms in Article I hereof.

## PRELIMINARY STATEMENT

The Company at the Closing Date is the owner of the Mortgage Loans and the other property being conveyed by it to the Trust. On the Closing Date, the Company will acquire the REMIC I Regular Interests and the Class R-1 Residual Interest from the Trust as consideration for its transfer to the Trust of the Mortgage Loans and certain other assets and will be the owner of the REMIC I Regular Interests and the Class R-1 Residual Interest. Thereafter on the Closing Date, the Company will acquire the Certificates (other than the Class R Certificates) and the Class R-2 Residual Interest from the Trust as consideration for its transfer to the Trust of the REMIC I Regular Interests and will be the owner of the Certificates. The Company has duly authorized the execution and delivery of this Agreement to provide for (i) the conveyance to the Trust of the Mortgage Loans and certain other assets, (ii) the issuance to the Company of the REMIC I Regular Interests and the Class R-1 Residual Interest representing in the aggregate the entire beneficial interest in REMIC I, (iii) the conveyance to the Trust of the REMIC I Regular Interests and (iv) the issuance to the Company of the REMIC II Regular Interests and the Certificates, such REMIC II Regular Interests and the Class R-2 Residual Interest representing in the aggregate the entire beneficial interest in REMIC II. The Company and the Servicer are entering into this Agreement, and the Trustee and the Delaware Trustee are each accepting the trust created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

The Certificates issued hereunder, other than the Junior Subordinate Certificates and the Class PPP Certificates, have been offered for sale pursuant to a Prospectus, dated July 13, 2005, and a Prospectus Supplement, dated August 23, 2005, of the Company (together, the "Prospectus"). The Junior Subordinate Certificates and the Class PPP Certificates have been offered for sale pursuant to a Private Placement Memorandum, dated August 25, 2005. The Trust created hereunder is intended to be the "Trust" described in the Prospectus and the Private Placement Memorandum and the Certificates are intended to be the "Certificates" described therein. The following tables set forth the designation, type of interest, Certificate Interest Rate, initial Class

Principal Balance and Final Maturity Date for the REMIC I Regular Interests, the REMIC II Regular Interests and the Class R Residual Interests:

## REMIC I Interests

| Class Designation for each REMIC I Regular Interest and the Class R-1 Residual Interest | Type of Interest | Certificate Interest Rate (1) | Initial Class Principal Balance | Final Maturity Date* |
|---|---|---|---|---|
| Class LT1 | Regular | Variable (2) | $3,200,574,388.99 | August 2045 |
| Class LT2 | Regular | Variable (2) | 145,408.25 | August 2045 |
| Class LT3 | Regular | Variable (3) | 174,698.67 | August 2045 |
| Class LT4 | Regular | Variable (4) | 174,698.67 | August 2045 |
| Class R-1† | Residual | 4.704% | 100.00 | August 2045 |

\*    The Distribution Date in the specified month, which is the month following the month in which the latest maturing Mortgage Loan matures. For federal income tax purposes, for each Class of REMIC I Regular and Residual Interests, the *"latest possible maturity date"* shall be the Final Maturity Date.

†    The Class R-1 Residual Interest is entitled to receive the applicable Residual Distribution Amount and any Excess Liquidation Proceeds.

(1)    Interest distributed to the REMIC I Regular Interests (other than the Class LT3 Regular Interest, which shall not be entitled to receive any distributions of interest) and the Class R-1 Residual Interest on each Distribution Date will have accrued at the applicable per annum Certificate Interest Rate on the applicable Class Principal Balance outstanding immediately before such Distribution Date.

(2)    For each Distribution Date, the Certificate Interest Rate on the Class LT1 and Class LT2 Regular Interests shall equal the Weighted Average Pass-Through Rate for such Distribution Date.

(3)    The Class LT3 Regular Interest shall not be entitled to receive any distributions of interest.

(4)    For each Distribution Date, the Certificate Interest Rate on the Class LT4 Regular Interest shall equal two (2) times the Weighted Average Pass-Through Rate for such Distribution Date.

As provided herein, with respect to REMIC I, the Servicer will cause an election to be made on behalf of REMIC I to be treated for federal income tax purposes as a REMIC. The REMIC I Regular Interests will be designated regular interests in REMIC I and the Class R-1 Residual Interest will be designated the sole class of residual interest in REMIC I, for purposes of the REMIC Provisions.

## REMIC II Interests

| Class Designation for each Class of REMIC II Regular Interests and the Class R-2 Residual Interest | Type of Interest | Certificate Interest Rate (1) | Initial Class Principal Balance | Final Maturity Date* |
|---|---|---|---|---|
| Class A-1A-L | Regular | Variable (2) (19) | $1,742,982,000.00 | August 2045 |
| Class A-1B1-L | Regular | Variable (3) (19) | 200,385,000.00 | August 2045 |
| Class A-1B2-L | Regular | Variable (4) (19) | 80,750,000.00 | August 2045 |
| Class A-1B3-L | Regular | Variable (5) (19) | 445,107,000.00 | August 2045 |
| Class A-1C1-L | Regular | Variable (6) (19) | 168,605,000.00 | August 2045 |
| Class A-1C2-L | Regular | Variable (7) (19) | 104,932,000.00 | August 2045 |
| Class A-1C3-L | Regular | Variable (8) (19) | 110,082,000.00 | August 2045 |
| Class A-1C4-L | Regular | Variable (9) (19) | 52,127,000.00 | August 2045 |
| Class X-L | Regular | Variable (10) (19) | 0.00 (11) | August 2045 |
| Class B-1-L | Regular | Variable (12) (19) | 62,421,000.00 | August 2045 |
| Class B-2-L | Regular | Variable (13) (19) | 44,815,000.00 | August 2045 |
| Class B-3-L | Regular | Variable (14) (19) | 22,407,000.00 | August 2045 |
| Class B-4-L | Regular | Variable (15) (19) | 22,407,000.00 | August 2045 |
| Class B-5-L | Regular | Variable (16) (19) | 19,206,000.00 | August 2045 |
| Class B-6-L | Regular | Variable (17) (19) | 17,606,000.00 | August 2045 |
| Class B-7-L | Regular | Variable (18) (19) | 11,204,000.00 | August 2045 |
| Class B-8-L | Regular | Variable (18) (19) | 9,603,000.00 | August 2045 |
| Class B-9-L | Regular | Variable (18) (19) | 12,804,000.00 | August 2045 |
| Class B-10-L | Regular | Variable (18) (19) | 12,804,000.00 | August 2045 |
| Class B-11-L | Regular | Variable (18) (19) | 8,003,000.00 | August 2045 |
| Class B-12-L | Regular | Variable (18) (19) | 32,011,000.00 | August 2045 |
| Class B-13-L | Regular | Variable (18) (19) | 20,808,194.58 | August 2045 |

| Class R-2 (20) | Residual | ----- | ----- | August 2045 |

\*     The Distribution Date in the specified month, which is the month following the month in which the latest maturing Mortgage Loan matures. For federal income tax purposes, for each Class of REMIC II Regular and Residual Interests, the *"latest possible maturity date"* shall be the Final Maturity Date.

(1)     Interest distributed to the REMIC II Regular Interests on each Distribution Date will have accrued at the applicable per annum Certificate Interest Rate on the applicable Class Principal Balance (or, in the case of the Class X-L Regular Interest, at the Class X-L Notional Amount) outstanding immediately before such Distribution Date.

(2)     The Certificate Interest Rate on the Class A-1A-L Regular Interest for (i) the initial Distribution Date shall equal 3.96125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.32% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.64% and (c) 10.50%.

(3)     The Certificate Interest Rate on the Class A-1B1-L Regular Interest for (i) the initial Distribution Date shall equal 3.93125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.29% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.58% and (c) 10.50%.

(4)     The Certificate Interest Rate on the Class A-1B2-L Regular Interest for (i) the initial Distribution Date shall equal 4.09125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.45% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.90% and (c) 10.50%.

(5)     The Certificate Interest Rate on the Class A-1B3-L Regular Interest for (i) the initial Distribution Date shall equal 4.04125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.40% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.80% and (c) 10.50%.

(6)     The Certificate Interest Rate on the Class A-1C1-L Regular Interest for (i) the initial Distribution Date shall equal 3.84125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.20% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.40% and (c) 10.50%.

(7)     The Certificate Interest Rate on the Class A-1C2-L Regular Interest for (i) the initial Distribution Date shall equal 4.06125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.42% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.84% and (c) 10.50%.

(8)     The Certificate Interest Rate on the Class A-1C3-L Regular Interest for (i) the initial Distribution Date shall equal 4.15125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.51% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 1.02% and (c) 10.50%.

(9)     The Certificate Interest Rate on the Class A-1C4-L Regular Interest for (i) the initial Distribution Date shall equal 4.08125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.44% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Adjusted Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.88% and (c) 10.50%.

(10)     For each Distribution Date, the Class X-L Regular Interest shall accrue interest on the Class X-L Notional Amount. For each Distribution Date, the Certificate Interest Rate on the Class X-L Regular Interest shall equal the excess, if any, of (i) the Weighted Average Pass-Through Rate for such Distribution Date over (ii) the product of (a) the weighted average of the Certificate Interest Rates on the REMIC II Regular Interests, multiplying, in the case of the Class A-L Regular Interests, the Certificate Interest Rates on the Class A-L Regular Interests by a fraction, the numerator being the actual number of days in the accrual period and the denominator being 30 and (b) a fraction, the numerator of which is the aggregate Class Principal Balance of the REMIC II Regular Interests (other than the Class X-L Regular Interest) immediately prior to that Distribution Date and the denominator of which is the aggregate principal balance of the Mortgage Loans as of the second preceding Due Date.

For REMIC purposes, the foregoing rate is equal to a rate per annum equal to the percentage equivalent of a fraction, the numerator of which is the sum of the amounts calculated pursuant to clauses (1) through (3) below, and the denominator of which is the aggregate Class Principal Balances of the REMIC I Regular Interests. For purposes of calculating the Certificate Interest Rate for the Class X-L Regular Interest, the numerator is equal to the sum of the following components:

        1.     the Certificate Interest Rate for REMIC I Regular Interest LT1 minus the related Marker Rate, applied to a notional amount equal to the Class Principal Balance of REMIC I Regular Interest LT1;

        2.     the Certificate Interest Rate for REMIC I Regular Interest LT2 minus the related Marker Rate, applied to a notional amount equal to the Class Principal Balance of REMIC I Regular Interest LT2; and

        3.     the Certificate Interest Rate for REMIC I Regular Interest LT4 minus twice the related Marker Rate, applied to a notional amount equal to the Class Principal Balance of REMIC I Regular Interest LT4.

(11)     The Class X-L Regular Interest shall have a Class Notional Amount and a Class Principal Balance. The Class X-L Principal Balance shall initially equal zero and shall thereafter be increased by the portion, if any, of Net Negative Amortization Amounts allocated to the

Class X-L Regular Interest pursuant to the definition of *"Net Negative Amortization Amount."* Interest shall accrue on the Class X-L Notional Amount and shall not accrue on the Class X-L Principal Balance. Principal shall not be payable with respect to the Class X-L Notional Amount.

(12)    The Certificate Interest Rate on the Class B-1-L Regular Interest for (i) the initial Distribution Date shall equal 4.25125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.61% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.915% and (c) 10.50%.

(13)    The Certificate Interest Rate on the Class B-2-L Regular Interest for (i) the initial Distribution Date shall equal 4.27125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.63% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.945% and (c) 10.50%.

(14)    The Certificate Interest Rate on the Class B-3-L Regular Interest for (i) the initial Distribution Date shall equal 4.32125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.68% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 1.02% and (c) 10.50%.

(15)    The Certificate Interest Rate on the Class B-4-L Regular Interest for (i) the initial Distribution Date shall equal 4.49125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.85% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 1.275% and (c) 10.50%.

(16)    The Certificate Interest Rate on the Class B-5-L Regular Interest for (i) the initial Distribution Date shall equal 4.59125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 0.95% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 1.425% and (c) 10.50%.

(17)    The Certificate Interest Rate on the Class B-6-L Regular Interest for (i) the initial Distribution Date shall equal 4.69125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 1.05% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 1.575% and (c) 10.50%.

(18)    The Certificate Interest Rate on the Class B-7-L Class B-8-L Class B-9-L, Class B-10-L, Class B-11-L, Class B-12-L and Class B-13-L Regular Interest for (i) the initial Distribution Date shall equal 4.84125%; (ii) each Distribution Date, other than the initial Distribution Date, on or before the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 1.20% and (c) 10.50%; and (iii) each Distribution Date after the Clean-Up Call Option Date, shall equal the least of (a) the Weighted Average Pass-Through Rate for such Distribution Date, (b) LIBOR plus 1.80% and (c) 10.50%.

(19)    For any Distribution Date, interest distributable to the Class A, Class B and Class X Certificates may not equal interest accrued at the Certificate Interest Rates for the Corresponding Classes of REMIC II Regular Interests. For any Distribution Date, interest may be distributable to some Classes of Class A and Class B Certificates in an amount greater than interest accrued at the Certificate Interest Rate for the Corresponding Class of REMIC II Regular Interests, and interest may be distributable to the Class X Certificates in an amount less than interest accrued at the Certificate Interest Rate for the Class X-L Regular Interest, in each case pursuant to the second sentence of Section 4.04(a).

(20)    The Class R–2 Residual Interest shall be entitled to receive the applicable Residual Distribution Amount. The Class R–2 Residual Interest shall not be entitled to receive any distributions of interest or principal.

For any Distribution Date, interest may be distributable to some Classes of Class A and Class B Certificates in an amount greater than interest accrued at the Certificate Interest Rate for the Corresponding Class of REMIC II Regular Interests

As provided herein, with respect to REMIC II, the Servicer will cause an election to be made on behalf of REMIC II to be treated for federal income tax purposes as a REMIC. The REMIC II Regular Interests will be designated regular interests in REMIC II and the Class R-2 Residual Interest will be designated the sole class of residual interest in REMIC II, for purposes of the REMIC Provisions.

In addition, the Trust will issue the Class R Certificates, which will represent ownership of the Class R-1 and Class R-2 Residual Interests.

In addition, the Trust will issue the Class A and Class B Certificates, each of which Class will represent ownership of the Corresponding Class of REMIC II Regular Interests and with respect to the each Class of Class A and Class B Certificates, will also represent ownership of the applicable rights specified in the second and fifth sentences of Section 4.04(a), and will issue the Class X Certificates, which will represent ownership of (i) the Class X-L Regular Interest and (ii) the obligations specified in the second sentence of Section 4.04(a).

In addition, the Trust will issue the Class PPP Certificates, which will not have a Class Principal Balance and will only be entitled to receive on any Distribution Date the aggregate of all Assigned Prepayment Premiums. The Class PPP Certificates will not represent an interest in any REMIC.

As of the Cut-Off Date, the Mortgage Loans have an aggregate Principal Balance of $3,201,069,294.58 and the Certificates have an Aggregate Certificate Principal Balance of $3,201,069,294.58.

## WITNESSETH:

WHEREAS, the Company is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware and has full corporate power and authority to enter into this Agreement and to undertake the obligations undertaken by it herein;

WHEREAS, the Servicer is a federal savings association duly organized and existing under and by virtue of the laws of the United States of America and has full power and authority to enter into this Agreement and to undertake the obligations undertaken by it herein;

WHEREAS, the Trustee is a national banking association duly organized and existing under the laws of the United States of America and has full power and authority to enter into this

Agreement;

WHEREAS, the Delaware Trustee is a banking corporation duly organized and existing under the laws of the State of Delaware and has full power and authority to enter into this Agreement;

WHEREAS, prior to the execution and delivery hereof, the Company and the Delaware Trustee have entered into the Original Trust Agreement, and the Delaware Trustee has filed the Certificate of Trust;

WHEREAS, it is the intention of the Company, the Servicer, the Trustee and the Delaware Trustee that the Trust created by this Agreement constitute a statutory trust under the Statutory Trust Statute, that this Agreement constitute the governing instrument of the Trust, and that this Agreement amend and restate the Original Trust Agreement;

WHEREAS, the Company is the owner of the Mortgage Loans identified in the Mortgage Loan Schedule hereto having unpaid Principal Balances on the Cut-Off Date as stated therein; and

WHEREAS, the Company has been duly authorized to create the Trust to (i) hold the Mortgage Loans and certain other property, (ii) issue the REMIC I Regular Interests and the Class R-1 Residual Interest, (iii) hold the REMIC I Regular Interests and (iv) issue the REMIC II Regular Interests and the Certificates.

NOW, THEREFORE, in order to declare the terms and conditions upon which the REMIC I Regular Interests, the REMIC II Regular Interests, the Class R Residual Interests and the Certificates are to be issued, and in consideration of the premises and of the purchase and acceptance of the Certificates by the Holders thereof, the Company covenants and agrees with the Servicer, the Trustee and the Delaware Trustee, for the equal and proportionate benefit of the respective Holders from time to time of the REMIC I Regular Interests, the REMIC II Regular Interests and the Certificates, as applicable, as follows:

ARTICLE I

Section 1.01.     *Definitions.*

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the following meanings:

*Adjusted Cap Rate*:  For any Distribution Date and any Class of Class A-L Regular Interests, a fraction, expressed as a per annum rate, the numerator of which is equal to the product of (i) the amount of interest distributions accrued on the Mortgage Loans at the Weighted Average Pass-Through Rate for that Distribution Date less the Net Negative Amortization Amount and (ii) 12, and the denominator of which is equal to the aggregate Principal Balance of the Mortgage Loans as of the second preceding Due Date after giving effect to the payments due on the Mortgage Loans on that Due Date multiplied, such fraction multiplied by a ratio, the numerator of which is 30 and the denominator of which is the actual number of days in the related certificate accrual period.

For any Distribution Date and any Class of Class B-L Regular Interests, the Weighted Average Pass-Through Rate, computed for this purpose by (i) reducing the Weighted Average Pass-Through Rate by a per annum rate equal to a fraction, the numerator of which is the Net Negative Amortization Amount with respect to the Mortgage Loans multiplied by 12, and the denominator of which is the aggregate Principal Balance of the Mortgage Loans as of the second preceding Due Date after giving effect to the payments due on the Mortgage Loans on that Due Date.

*Adjusted Weighted Average Pass-Through Rate*:  For any Distribution Date, the product of (i) the Weighted Average Pass-Through Rate for such Distribution Date and (ii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related No-Delay Accrual Period.

*Aggregate Certificate Principal Balance*:  At any given time, the sum of the then current Class Principal Balances of the Certificates.

*Appraised Value*:  With respect to any (i) Mortgage Loan that is not a Streamlined Mortgage Loan or ROV Mortgage Loan, the lesser of (a) the value set forth on the appraisal made in connection with the origination of such Mortgage Loan as the value of the related Mortgaged Property and (b) the purchase price paid for the Mortgaged Property, provided, however, that if such Mortgage Loan was originated in connection with the refinance of a mortgage loan, such value shall be based solely on the appraisal made in connection with the origination of such Mortgage Loan; (ii) ROV Mortgage Loan, the lesser of (a) the value set forth on the residential appraisal review made in connection with the origination of such Mortgage Loan as the value of the related Mortgaged Property and (b) the purchase price paid for the Mortgaged Property, provided, however, that if such ROV Mortgage Loan was originated in connection with the refinance of a mortgage loan, such value shall be based solely on the residential appraisal review made in connection with the origination of such ROV Mortgage Loan; and (iii) Streamlined Mortgage Loan, the value set forth in the appraisal made in connection with the origination of the mortgage loan being refinanced.

*Assigned Prepayment Premiums*:  For any Distribution Date, any Prepayment Premium on a Mortgage Loan and any other Prepayment Premium on deposit in the Certificate Account received in the Prior Period.

*Assignment of Proprietary Lease*:  With respect to a Cooperative Loan, the assignment or mortgage of the related Cooperative Lease from the Mortgagor to the originator of the Cooperative Loan.

*Authenticating Agent*:  Any authenticating agent appointed by the Trustee pursuant to Section 8.11.

*Authorized Denomination*:  With respect to each Class of Certificates (other than the Class X and Class R Certificates), an initial Certificate Principal Balance equal to $25,000 and multiples of $1 in excess thereof, except that one Certificate of each Class of the Junior Subordinate Certificates may be issued in an amount that is not an integral multiple of $1.  With respect to the Class X Certificates, a Class Notional Amount as of the Cut-Off Date equal to $100,000 and multiples of $1 in excess thereof.  With respect to the Class R Certificates, one Certificate with a Percentage Interest equal to 0.01% and one Certificate with a Percentage Interest equal to 99.99%.  The Class PPP Certificates will be issued in fully registered form in minimum denominations of 20% of the Percentage Interest therein and increments of 10% in excess thereof.

*Bankruptcy Loss*:  A loss on a Mortgage Loan arising out of (i) a reduction in the Minimum Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a case under the United States Bankruptcy Code, other than any such reduction that arises out of clause (ii) of this definition of *"Bankruptcy Loss,"* including, without limitation, any such reduction that results in a permanent forgiveness of principal, or (ii) with respect to any Mortgage Loan, a valuation, by a court of competent jurisdiction in a case under such Bankruptcy Code, of the related Mortgaged Property in an amount less than the then outstanding Principal Balance of such Mortgage Loan.

*Beneficial Holder*:  A Person holding a beneficial interest in any Book-Entry Certificate as or through a DTC Participant or an Indirect DTC Participant or a Person holding a beneficial interest in any Definitive Certificate.

*Benefit Plan Opinion*:  With respect to any Certificate presented for registration in the name of any Person, an Opinion of Counsel acceptable to and in form and substance satisfactory to the Trustee and the Company to the effect that the purchase or holding of such Certificate is permissible under applicable law, will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, and will not subject the Trust, the Trustee, the Delaware Trustee, the Servicer or the Company to any obligation or liability

(including obligations or liabilities under Section 406 of ERISA or Section 4975 of the Code) in addition to those undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Trust, the Trustee, the Delaware Trustee, the Servicer or the Company.

*Book-Entry Certificates*:  The Class A, Class X and Senior Subordinate Certificates, beneficial ownership and transfers of which shall be made through book entries as described in Section 5.07.

*BSFP*:  Bear Stearns Financial Products Inc.

*Business Day*:  Any day other than a Saturday or a Sunday or a day on which banking institutions in Stockton, California, Chicago, Illinois, New York, New York, Seattle, Washington or any city in which the Corporate Trust Office is located (which shall initially be Santa Ana, California) are authorized or obligated by law or executive order to be closed.

*Buydown Agreement*:  An agreement between a Person and a Mortgagor pursuant to which such Person has provided a Buydown Fund.

*Buydown Fund*:  A fund provided by the originator of a Mortgage Loan or another Person with respect to a Buydown Loan which provides an amount sufficient to subsidize regularly scheduled principal and interest payments due on such Buydown Loan for a period.  Buydown Funds may be (i) funded at the par values of future payment subsidies, or (ii) funded in an amount less than the par values of future payment subsidies, and determined by discounting such par values in accordance with interest accruing on such amounts, in which event they will be deposited in an account bearing interest. Buydown Funds may be held in a separate Buydown Fund Account or may be held in a Custodial Account for P&I or a Custodial Account for Reserves and monitored by the Servicer.

*Buydown Fund Account*:  A separate account or accounts created and maintained pursuant to Section 3.02 (a) with a financial institution approved by the Servicer, (b) within FDIC insured accounts (or other accounts with comparable insurance coverage acceptable to the Rating Agencies) created, maintained and monitored by the Servicer or (c) in a separate non-trust account without FDIC or other insurance in an Eligible Institution (including the Trustee). Such account or accounts may be non-interest bearing or may bear interest. In the event that a Buydown Fund Account is established pursuant to clause (b) of the preceding sentence, amounts held in such Buydown Fund Account shall not exceed the level of deposit insurance coverage on such account; accordingly, more than one Buydown Fund Account may be established.

*Buydown Loan*:  A Mortgage Loan for which the Mortgage Interest Rate has been subsidized through a Buydown Fund provided at the time of origination of such Mortgage Loan.

*Cap Counterparty*:  BSFP.

*Cap Strike Rate*:  For any Distribution Date, the amount set forth under the heading *"Strike Rate"* in Schedule 1 of the Prospectus.

*Carry-Forward Subsequent Recoveries Amount*:  For any Distribution Date, the excess, if any, of (i) the Subsequent Recoveries for such Distribution Date over (ii) the amount by which the Class Principal Balance of the Class of Subordinate Certificates with the lowest priority is increased in respect of Subsequent Recoveries on such Distribution Date pursuant to the definition of *"Class Principal Balance"* herein.

*Carryover Shortfall Amount*:  For any Distribution Date and for any Class of Class A Certificates and any Class of Class B Certificates, the sum of: (i) the excess, if any, of (a) the amount of interest that would have accrued on the Class Principal Balance of such Class' Corresponding Class immediately before such Distribution Date, during the No-Delay Accrual Period, at a Certificate Interest Rate equal to the lesser of (1) LIBOR plus the related margin for such Class for such Distribution Date (as specified in the applicable note to the table entitled *"REMIC II Interests"* in the Preliminary Statement hereto) and (2) 10.50%, over (b) the amount of interest that accrued on such Class Principal Balance, during the No-Delay Accrual Period, at the actual Certificate Interest Rate for such Class for such Distribution Date, (ii) the portion of the amount described in clause (i) above remaining unpaid from prior Distribution Dates, and (iii) one month's interest at the Certificate Interest Rate described in clause (i)(a) above on the amount described in clause (ii) above.

*Carryover Shortfall Payment*:  For any Class of Class A Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date reduced by the Yield Maintenance Payment for such Class for such Distribution Date and (b) such Class' pro rata share of the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date (such pro rata share calculated based on an allocation of such Interest Distribution Amount among the Classes of Class A Certificates pro rata according to Carryover Shortfall Amount for such Distribution Date).

For the Class B-1 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A Certificates for such Distribution Date.

For the Class B-2 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A and Class B-1 Certificates for such Distribution Date.

For the Class B-3 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1 and Class B-2 Certificates for such Distribution Date.

For the Class B-4 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2 and Class B-3 Certificates for such Distribution Date.

For the Class B-5 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates for such Distribution Date.

For the Class B-6 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2, Class B-3, Class B-4 and Class B-5 Certificates for such Distribution Date.

For the Class B-7 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5 and Class B-6 Certificates for such Distribution Date.

For the Class B-8 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6 and Class B-7 Certificates for such Distribution Date.

For the Class B-9 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7 and Class B-8 Certificates for such Distribution Date.

For the Class B-10 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8 and Class B-9 Certificates for such Distribution Date.

For the Class B-11 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9 and Class B-10 Certificates for such Distribution Date.

For the Class B-12 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9, Class B-10 and Class B-11 Certificates for such Distribution Date.

For the Class B-13 Certificates for any Distribution Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) the excess, if any, of (i) the Interest Distribution Amount for the Class X-L Regular Interest for such Distribution Date over (ii) the aggregate of the Carryover Shortfall Payments for the Class A, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9, Class B-10, Class B-11 and Class B-12 Certificates for such Distribution Date.

*Certificate*:  Any one of the Certificates issued pursuant to this Agreement, executed by the Trustee and authenticated by or on behalf of the Trustee hereunder in substantially one of the forms set forth in Exhibit A and B hereto. The additional matter appearing in Exhibit H shall be deemed incorporated into Exhibit A as though set forth at the end of such Exhibit.

*Certificate Account*:  The separate trust account created and maintained with the Trustee, the Investment Depository or any other bank or trust company acceptable to the Rating Agencies which is incorporated under the laws of the United States of America or any state thereof pursuant to Section 3.04, which account shall bear a designation clearly indicating that the funds deposited therein are held in trust for the benefit of the Trust or any other account serving a similar function acceptable to the Rating Agencies. Funds in the Certificate Account may be invested in Eligible Investments pursuant to Section 3.04(b) and reinvestment earnings thereon shall be paid to the Servicer as additional servicing compensation. Funds deposited in the Certificate Account (exclusive of the Servicing Fee) shall be held in trust for the Certificateholders and for the uses and purposes set forth in Section 2.01, Section 3.04, Section 3.05, Section 4.01 and Section 4.04.

*Certificateholder or Holder*:  With respect to the Certificates, the Person in whose name a Certificate is registered in the Certificate Register, except that, solely for the purposes of giving any consent pursuant to this Agreement, any Certificate registered in the name of the Company, the Servicer or any affiliate thereof shall be deemed not to be outstanding and the Percentage Interest evidenced thereby shall not be taken into account in determining whether the requisite percentage of Percentage Interests necessary to effect any such consent has been obtained; provided, that the Trustee may conclusively rely upon an Officer's Certificate to determine whether any Person is an affiliate of the Company or the Servicer.  With respect to the REMIC I Regular Interests, the owner of the REMIC I Regular Interests, which as of the Closing Date shall be the Trust.  With respect to each Class of REMIC II Regular Interests, the Holder of the Corresponding Class of Certificates.

*Certificate Interest Rate*:  For each Class of REMIC I Regular Interests and REMIC II Regular Interests and the Class R-1 Residual Interest, the per annum rate set forth as the Certificate Interest Rate for such Class in the Preliminary Statement hereto.

*Certificate of Trust*:  The certificate of trust filed with respect to the Trust with the Secretary of State in accordance with Section 3810(a) of the Statutory Trust Statute.

*Certificate Principal Balance*:  For each Certificate of any Class, the portion of the related Class Principal Balance, if any, represented by such Certificate; *provided, however*, that each Class X Certificate will represent a portion of the Class X PO Principal Balance equal to its Percentage Interest in the Class X-L Notional Amount.

*Certificate Register and Certificate Registrar*:  The register maintained and the registrar appointed, respectively, pursuant to Section 5.03.

*Class*:  All REMIC I Regular Interests or the Class R-1 Residual Interest having the same priority and rights to payments on the Mortgage Loans from the REMIC I Available Distribution Amount, and all REMIC II Regular Interests or the Class R-2 Residual Interest having the same priority and rights to payments on the REMIC I Regular Interests from the REMIC II Available Distribution Amount, as applicable, which REMIC I Regular Interests, REMIC II Regular Interests and Class R Residual Interests, as applicable, shall be designated as a separate Class, and which, in the case of the Certificates (including the Class R Certificates representing ownership of the Class R Residual Interests), shall be set forth in the applicable forms of Certificates attached hereto as Exhibits A and B.  Each Class of REMIC I Regular Interests and the Class R-1 Residual Interest shall be entitled to receive the amounts allocated to such Class pursuant to the definition of *"REMIC I Distribution Amount"* only to the extent of the REMIC I Available Distribution Amount for such Distribution Date remaining after distributions in accordance with prior clauses of the definition of *"REMIC I Distribution Amount"* and each Class of REMIC II Regular Interests and the Class R-2 Residual Interest shall be entitled to receive the amounts allocated to such Class pursuant to the definition of *"REMIC II Distribution Amount"* only to the extent of the REMIC II Available Distribution Amount for such Distribution Date remaining after distributions in accordance with prior clauses of the definition of *"REMIC II Distribution Amount."* The Class PPP Certificates shall only be entitled to receive on any Distribution Date the aggregate of all Assigned Prepayment Premiums as specified in Section 4.04(a).

In addition to their rights to receive payments from the REMIC II Available Distribution Amount on their Corresponding Class of REMIC II Regular Interests, (i) the Class A Certificates shall be entitled to receive payments, if any, as specified in the second and fifth sentences of Section 4.04(a) and (ii) the Class B Certificates shall be entitled to receive payments, if any, as specified in the second sentence of Section 4.04(a).  Notwithstanding the right of the Class X Certificates to receive payments from the REMIC II Available Distribution Amount on the Class X-L Regular Interest, the amount of such payments may be reduced as specified in the second sentence of Section 4.04(a).

*Class A Certificates*:  The Class A-1A, Class A-1B1, Class A-1B2, Class A-1B3, Class A-1C1, Class A-1C2, Class A-1C3 and Class A-1C4 Certificates.

*Class A-L Regular Interests*:  The Class A-1A-L, Class A-1B1-L, Class A-1B2-L, Class A-1B3-L, Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Regular Interests.

*Class A-1A Certificates*:  The Certificates. designated as *"Class A-1A"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class A-1A-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class A-1B1 Certificates*:  The Certificates. designated as *"Class A-1B1"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class A-1B1-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class A-1B2 Certificates*:  The Certificates. designated as *"Class A-1B2"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class A-1B2-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class A-1B3 Certificates*:  The Certificates. designated as *"Class A-1B3"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class A-1B3-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class A-1C1 Certificates*:  The Certificates. designated as *"Class A-1C1"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class A-1C1-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class A-1C2 Certificates*:  The Certificates. designated as *"Class A-1C2"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class A-1C2-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class A-1C3 Certificates*:  The Certificates. designated as *"Class A-1C3"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class A-1C3-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class A-1C4 Certificates*:  The Certificates. designated as *"Class A-1C4"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class A-1C4-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B Certificates*: The Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class B-6, Class B-7, Class B-8, Class B-9, Class B-10, Class B-11, Class B-12 and Class B-13 Certificates.

*Class B-1 Certificates*:  The Certificates designated as *"Class B-1"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-L Regular Interests*:  The Class B-1-L, Class B-2-L, Class B-3-L, Class B-4-L, Class B-5-L, Class B-6-L, Class B-7-L, Class B-8-L, Class B-9-L, Class B-10-L, Class B-11-L, Class B-12-L and Class B-13-L Regular Interests.

*Class B-1-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-2 Certificates*:  The Certificates designated as *"Class B-2"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-2-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-3 Certificates*:  The Certificates designated as *"Class B-3"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-3-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-4 Certificates*:  The Certificates designated as *"Class B-4"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-4-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-5 Certificates*:  The Certificates designated as *"Class B-5"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-5-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-6 Certificates*:  The Certificates designated as *"Class B-6"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-6-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-7 Certificates*:  The Certificates designated as *"Class B-7"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-7-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-8 Certificates*:  The Certificates designated as *"Class B-8"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-8-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-9 Certificates*:  The Certificates designated as *"Class B-9"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-9-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-10 Certificates*:  The Certificates designated as *"Class B-10"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-10-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-11 Certificates*:  The Certificates designated as *"Class B-11"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-11-L Regular Interest*: The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-12 Certificates*: The Certificates designated as *"Class B-12"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-12-L Regular Interest*: The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class B-13 Certificates*: The Certificates designated as *"Class B-13"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class B-13-L Regular Interest*: The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class LT Principal Reduction Amounts:* For any Distribution Date, the amounts by which the Class Principal Balances of the Class LT1, Class LT2, Class LT3 and Class LT4 Regular Interests, respectively, will be reduced on such Distribution Date by the allocation of Realized Losses and the distribution of principal, determined as described in Appendix 1.

*Class LT Regular Interests*: The Class LT1, Class LT2, Class LT3 and Class LT4 Regular Interests.

*Class LT1 Regular Interest*: The uncertificated undivided beneficial interest in REMIC I which constitutes a REMIC I Regular Interest and is entitled to distributions as set forth herein.

*Class LT2 Principal Distribution Amount:* For any Distribution Date, the excess, if any, of the Class LT2 Principal Reduction Amount for such Distribution Date over the principal portion of Realized Losses allocated to the Class LT2 Regular Interest on such Distribution Date.

*Class LT2 Regular Interest*: The uncertificated undivided beneficial interest in REMIC I which constitutes a REMIC I Regular Interest and is entitled to distributions as set forth herein.

*Class LT3 Principal Distribution Amount:* For any Distribution Date, the excess, if any, of the Class LT3 Principal Reduction Amount for such Distribution Date over the principal portion of Realized Losses allocated to the Class LT3 Regular Interest on such Distribution Date.

*Class LT3 Regular Interest*: The uncertificated undivided beneficial interest in REMIC I which constitutes a REMIC I Regular Interest and is entitled to distributions as set forth herein.

*Class LT4 Principal Distribution Amount:* For any Distribution Date, the excess, if any, of the Class LT4 Principal Reduction Amount for such Distribution Date over the principal portion of Realized Losses allocated to the Class LT4 Regular Interest on such Distribution Date.

*Class LT4 Regular Interest*: The uncertificated undivided beneficial interest in REMIC I which constitutes a REMIC I Regular Interest and is entitled to distributions as set forth herein.

*Class Notional Amount*: With respect to the Class X Certificates and the Class X-L Regular Interest, the Class X-L Notional Amount.

*Class PPP Certificates*: The Certificates designated as *"Class PPP"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class Principal Balance*: For any Class of REMIC I or REMIC II Regular Interests and for the Class R-1 Residual Interest, the applicable initial Class Principal Balance therefor set forth in the Preliminary Statement hereto (or, in the case of the Class R Certificates, the Class Principal Balance of the Class R-1 Residual Interest), corresponding to the rights of such Class in payments of principal due to be passed through to such Class from principal payments on the Mortgage Loans or the REMIC I Regular Interests, as applicable, as reduced from time to time by (x) distributions of principal to such Class and (y) the portion of Realized Losses allocated to the Class Principal Balance of such Class pursuant to the definition of *"Realized Loss"* with respect to a given Distribution Date, and as increased from time to time by the portion of Net Negative Amortization Amounts allocated to the Class Principal Balance of such Class pursuant to the definition of *"Net Negative Amortization Amount"* with respect to a given Distribution Date; and for any Class of Certificates or Components, as applicable, the Class Principal Balance of the Corresponding Class of REMIC II Regular Interests. For any Distribution Date, the reduction of the Class Principal Balance of any Class of Certificates or Components, as applicable, and REMIC I or REMIC II Regular Interests pursuant to the definition of *"Realized Loss"* and the increase in the Class Principal Balance of any Class of Certificates or Components, as applicable, and REMIC I or REMIC II Regular Interests pursuant to the definition of *"Net Negative Amortization Amount"* shall be deemed effective after the determination and distribution of principal on such Class pursuant to the definitions of *"REMIC I Distribution Amount"* and *"REMIC II Distribution Amount."*

Notwithstanding the foregoing, (A) any amounts distributed in respect of principal losses pursuant to paragraph (I) (xxxxiii) of the definition of *"REMIC II Distribution Amount"* shall not cause a reduction in the Class Principal Balances of the REMIC II Regular Interests or their Corresponding Classes and (B) any amounts distributed in respect of principal losses pursuant to clause (v) of the definition of *"REMIC I Distribution Amount"* shall not cause a reduction in the Class Principal Balances of the REMIC I Regular Interests.

In addition to the foregoing, on each Distribution Date, the Class Principal Balance of the Class of Subordinate Certificates with the lowest priority then outstanding (and its Corresponding Class of REMIC II Regular Interests) shall be increased by an amount equal to the lesser of (i) the Subsequent Recoveries for such Distribution Date and (ii) the amount of Realized Losses allocated to such Class on previous Distribution Dates (the amount in this clause (ii) reduced by the amount, if any, by which such Class Principal Balance has been increased on prior Distribution Dates pursuant to this paragraph).

The Class Principal Balance for the Class A-1A Certificates shall be referred to as the *"Class A-1A Principal Balance,"* the Class Principal Balance for the Class A-1A-L Regular Interest shall be referred to as the *"Class A-1A-L Principal Balance"* and so on. The Class Principal Balances for the Class X PO Component of the Class X-L Regular Interest shall be zero as of the Closing Date and shall increase after the Closing Date by the portion, if any, of Net Negative Amortization Amounts allocated to the Class X-L Regular Interest pursuant to the definition of *"Net Negative Amortization Amount"*.

*Class R Certificates*: The Certificates designated as *"Class R"* on the face thereof in substantially the form attached hereto as Exhibit B, representing ownership of the Class R-1 and Class R-2 Residual Interests, each of which Class of Residual Interests has been designated as the sole class of *"residual interest"* in REMIC I and REMIC II, respectively, pursuant to Section 2.06 and Section 2.11, respectively, for purposes of Section 860G(a)(2) of the Code.

*Class R Residual Interests*: The Class R-1 and Class R-2 Residual Interests (which shall be transferable only as a unit evidenced by the Class R Certificates, in accordance with the applicable provisions of Section 5.01).

*Class R-1 Residual Interest*: The uncertificated undivided beneficial interest in REMIC I which has been designated as the single class of *"residual interest"* in REMIC I pursuant to Section 2.06. The Class R-1 Residual Interest, together with the REMIC I Regular Interests, shall be deemed to be a separate series of beneficial interests in the assets of the Trust consisting of the REMIC I Assets pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

*Class R-2 Residual Interest*: The uncertificated undivided beneficial interest in REMIC II which has been designated as the single class of *"residual interest"* in REMIC II pursuant to Section 2.11. The Class R-2 Residual Interest, together with the REMIC II Regular Interests, shall be deemed to be a separate series of beneficial interests in the assets of the Trust consisting of the REMIC II Assets pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

*Class X Certificates*:  The Certificates designated as *"Class X"* on the face thereof in substantially the form attached hereto as Exhibit A.

*Class X-L Notional Amount*:  For any Distribution Date, the aggregate principal balance of the Mortgage Loans as of the second preceding Due Date after giving effect to the payments due on the Mortgage Loans on that Due Date.

*Class X-L Regular Interest*:  The uncertificated undivided beneficial interest in REMIC II which constitutes a REMIC II Regular Interest and is entitled to distributions as set forth herein.

*Class X PO Component*:  The principal-only component of the Class X Certificate; in the event interest accrued on the Class X-L Notional Amount is reduced as a result of the Net Negative Amortization Amount, such amount will be added as principal to the outstanding component principal balance of the Class X PO Component. The principal balance of the Class X PO Component will initially be zero.

*Clean-Up Call Option Date*:  The date on which the aggregate principal balance of the Mortgage Loans has been reduced to less than the Clean-Up Call Percentage of that balance as of the Cut-Off Date.

*Clean-Up Call Percentage*:  10%.

*Clearing Agency*:  An organization registered as a *"clearing agency"* pursuant to Section 17A of the Securities Exchange Act of 1934, as amended, which initially shall be DTC.

*Closing Date*:  August 25, 2005, which is the date of settlement of the sale of the Certificates to the original purchasers thereof.

*Closing Date Loan-to-Value Ratio*:  For each Mortgage Loan, the principal balance of such Mortgage Loan as of the Cut-Off Date (after application of all scheduled principal payments due on or before the Cut-Off Date) divided by the value of the related Mortgaged Property as of the Closing Date.

*Code*:  The Internal Revenue Code of 1986, as amended.

*Company*:  Washington Mutual Mortgage Securities Corp., a Delaware corporation, or its successor-in-interest.

*Compensating Interest*: For any Distribution Date, the least of (i) the sum of (a) 1/12 of 0.050% of the aggregate Principal Balance of the Mortgage Loans immediately before such Distribution Date, (b) the aggregate Payoff Earnings with respect to the Mortgage Loans for such Distribution Date and (c) the aggregate Payoff Interest with respect to the Mortgage Loans for such Distribution Date; (ii) the aggregate Uncollected Interest with respect to the Mortgage Loans for such Distribution Date and (iii) 1/12 of 0.125% of the aggregate Principal Balance of the Mortgage Loans immediately before such Distribution Date.

*Cooperative*:  A private, cooperative housing corporation which owns or leases land and all or part of a building or buildings, including apartments, spaces used for commercial purposes and common areas therein and whose board of directors authorizes, among other things, the sale of Cooperative Stock.

*Cooperative Apartment*:  A dwelling unit in a multi-dwelling building owned or leased by a Cooperative, which unit the Mortgagor has an exclusive right to occupy pursuant to the terms of a proprietary lease or occupancy agreement.

*Cooperative Lease*:  With respect to a Cooperative Loan, the proprietary lease or occupancy agreement with respect to the Cooperative Apartment occupied by the Mortgagor and relating to the related Cooperative Stock, which lease or agreement confers an exclusive right to the holder of such Cooperative Stock to occupy such apartment.

*Cooperative Loans*:  Any of the Mortgage Loans made in respect of a Cooperative Apartment, evidenced by a Mortgage Note and secured by (i) a Security Agreement, (ii) the related Cooperative Stock Certificate, (iii) an assignment or mortgage of the Cooperative Lease, (iv) financing statements and (v) a stock power (or other similar instrument), and ancillary thereto, a Recognition Agreement, each of which was transferred and assigned to the Trust pursuant to Section 2.04.

*Cooperative Stock*:  With respect to a Cooperative Loan, the single outstanding class of stock, partnership interest or other ownership instrument in the related Cooperative.

*Cooperative Stock Certificate*:  With respect to a Cooperative Loan, the stock certificate or other instrument evidencing the related Cooperative Stock.

*Corporate Trust Office*:  The corporate trust office of the Trustee in the State of California, at which at any particular time its corporate trust business with respect to this Agreement shall be administered, which office at the date of the execution of this Agreement is located at 1761 East St. Andrew Place, Santa Ana, CA 92705, Attention: Trust Administration WA05AA.

*Corporation*:  Any Person (other than an individual, partnership, joint venture or unincorporated organization) incorporated, associated, organized, chartered or existing under the laws of any state or under the federal laws of the United States of America; *provided*, that such Person have indefinite existence under the law of its domicile.

*Corresponding Class*:  With respect to the Class A, Class X and Class B Certificates and the REMIC II Regular Interests, the *"Corresponding Class"* shall be as indicated in the following table:

| | |
|---|---|
| Class A-1A-L | Class A-1A |
| Class A-1B1-L | Class A-1B1 |
| Class A-1B2-L | Class A-1B2 |
| Class A-1B3-L | Class A-1B3 |
| Class A-1C1-L | Class A-1C1 |
| Class A-1C2-L | Class A-1C2 |
| Class A-1C3-L | Class A-1C3 |
| Class A-1C4-L | Class A-1C4 |
| Class X-L | Class X |
| Class B-1-L | Class B-1 |
| Class B-2-L | Class B-2 |
| Class B-3-L | Class B-3 |
| Class B-4-L | Class B-4 |
| Class B-5-L | Class B-5 |
| Class B-6-L | Class B-6 |
| Class B-7-L | Class B-7 |

|  |  |
|---|---|
| Class B-8-L | Class B-8 |
| Class B-9-L | Class B-9 |
| Class B-10-L | Class B-10 |
| Class B-11-L | Class B-11 |
| Class B-12-L | Class B-12 |
| Class B-13-L | Class B-13 |

*Credit Support Depletion Date*:  The first Distribution Date on which the aggregate Class Principal Balance of the Class B Certificates has been or will be reduced to zero as a result of principal distributions thereon and the allocation of Realized Losses on such Distribution Date.

*Cumulative Carry-Forward Subsequent Recoveries Amount*:  For any Distribution Date, the sum of (i) the Carry-Forward Subsequent Recoveries Amount for such Distribution Date and (ii) the Carry-Forward Subsequent Recoveries Amounts for prior Distribution Dates to the extent such Carry-Forward Subsequent Recoveries Amounts have not been applied in reduction of Realized Losses on prior Distribution Dates pursuant to the first paragraph of the definition of *"Realized Loss"* herein.

*Curtailment*:  Any payment of principal on a Mortgage Loan made by or on behalf of the related Mortgagor, other than a Minimum Monthly Payment, a Prepaid Monthly Payment or a Payoff, which is applied to reduce the outstanding principal balance of the Mortgage Loan.  (Prepayment penalties are not payments of principal and hence Curtailments do not include prepayment penalties).

*Curtailment Shortfall*:  For any Distribution Date and for any Curtailment applied with a Minimum Monthly Payment in the Prior Period other than a Prepaid Monthly Payment, an amount equal to one month's interest on such Curtailment at the applicable Pass-Through Rate on such Mortgage Loan.

*Custodial Account for P&I*:  The custodial account for principal and interest established and maintained by the Servicer pursuant to Section 3.02 either (a) with the corporate trust department of the Trustee or another financial institution approved by the Servicer such that the rights of the Servicer, the Trustee, the Trust, the Delaware Trustee and the Certificateholders thereto shall be fully protected against the claims of any creditors or depositors of the institution in which such account is maintained, (b) within FDIC insured accounts (or other accounts with comparable insurance coverage acceptable to the Rating Agencies) created, maintained and monitored by the Servicer or (c) as a separate account at an Eligible Institution. In the event that a Custodial Account for P&I is established pursuant to clause (b) of the preceding sentence, amounts held in such Custodial Account for P&I shall not exceed the level of deposit insurance coverage on such account; accordingly, more than one Custodial Account for P&I may be established. Any amount that is at any time not protected or insured to the extent, if any, required by the first sentence of this definition of *"Custodial Account for P&I"* shall promptly be withdrawn from such Custodial Account for P&I and be remitted to the Investment Account.  In the event that a Custodial Account for P&I is established pursuant to clause (c), it shall be entitled *"Washington Mutual Bank in trust for holders of WaMu Mortgage Pass-Through Certificates, Series 2005–AR11."*

*Custodial Account for Reserves*:  The custodial account for reserves established and maintained by the Servicer pursuant to Section 3.02 either (a) with the corporate trust department of the Trustee or another financial institution approved by the Servicer such that the rights of the Servicer, the Trustee, the Trust, the Delaware Trustee and the Certificateholders thereto shall be fully protected against the claims of any creditors or depositors of the institution in which such account is maintained, (b) within FDIC insured accounts (or other accounts with comparable insurance coverage acceptable to the Rating Agencies) created, maintained and monitored by the Servicer or (c) as a separate account at an Eligible Institution. In the event that a Custodial Account for Reserves is established pursuant to clause (b) of the preceding sentence, amounts held in such Custodial Account for Reserves shall not exceed the level of deposit insurance coverage on such account; accordingly, more than one Custodial Account for Reserves may be established. Any amount that is at any time not protected or insured to the extent, if any, required by the first sentence of this definition of *"Custodial Account for Reserves"* shall promptly be withdrawn from such Custodial Account for Reserves and be remitted to the Investment Account. In the event that a Custodial Account for Reserves is established pursuant to clause (c), it shall be entitled *"Washington Mutual Bank in trust for various mortgagors and/or holders of WaMu Mortgage Pass-Through Certificates, Series 2005–AR11."*

*Custodial Agreement*:  The agreement, if any, between the Trustee and a Custodian (or the Trustee, a Custodian and the Servicer) providing for the safekeeping of the Mortgage Files on behalf of the Trust.

*Custodian*:  A custodian which is appointed by the Trustee with the consent of the Servicer, as provided in Article II hereof, pursuant to a Custodial Agreement. Any Custodian so appointed shall act as agent on behalf of the Trustee.  The reasonable fees and expenses of the Custodian shall be paid by the Servicer.  The Trustee shall remain at all times responsible under the terms of this Agreement, notwithstanding the fact that certain duties have been assigned to a Custodian.

*Cut-Off Date*:  August 1, 2005.

*Definitive Certificates*:  Certificates in definitive, fully registered and certificated form.

*Delaware Trustee*:  Deutsche Bank Trust Company Delaware, or its successor-in-interest as provided in Section 8.09, or any successor trustee appointed as herein provided.

*Depositary Agreement*:  The Letter of Representations, dated August 24, 2005, by and among DTC, the Trust and the Trustee.  The Trustee is authorized to enter into the Depositary Agreement on behalf of the Trust.

*Destroyed Mortgage Note*:  A Mortgage Note the original of which (or a portion of the original of which) was permanently lost or destroyed and has not been replaced.

*Determination Date*:  A day not later than the 10th day preceding a related Distribution Date, as determined by the Servicer.

*Disqualified Organization*:  Any Person which is not a Permitted Transferee, but does not include any Pass-Through Entity which owns or holds a Residual Certificate and of which a Disqualified Organization, directly or indirectly, may be a stockholder, partner or beneficiary.

*Distribution Date*:  With respect to distributions on the REMIC I and REMIC II Regular Interests and the Certificates, the 25th day (or, if such 25th day is not a Business Day, the Business Day immediately succeeding such 25th day) of each month, with the first such date being September 26, 2005.  The *"related Due Date"* for any Distribution Date is the Due Date immediately preceding such Distribution Date.

*DTC*:  The Depository Trust Company.

*DTC Participant*:  A broker, dealer, bank, other financial institution or other Person for whom DTC effects book-entry transfers and pledges of securities deposited with DTC.

*Due Date*:  The day on which the Minimum Monthly Payment for each Mortgage Loan is due.

*Eligible Institution*:  An institution having (i) the highest short-term debt rating, and one of the two highest long-term debt ratings of the Rating Agencies, (ii) with respect to any Custodial Account for P&I and special Custodial Account for Reserves, an unsecured long-term debt rating of at least one of the two highest unsecured long-term debt ratings of the Rating Agencies, (iii) with respect to any Buydown Fund Account or Custodial Account which also serves as a Buydown Fund Account, the highest unsecured long-term debt rating by the Rating Agencies, or (iv) the approval of the Rating Agencies.  Notwithstanding the foregoing, Washington Mutual Bank shall be an *"Eligible Institution"* if the following conditions are satisfied: (i) Washington Mutual Bank is acting as Servicer, (ii) if S&P is a Rating Agency as defined herein, the long-term unsecured debt obligations of Washington Mutual Bank are rated no lower than *"A-"* by S&P and the short-term unsecured debt obligations of Washington Mutual Bank are rated no lower than *"A-2"* by S&P, (iii) if Fitch is a Rating Agency as defined herein, the long-term unsecured debt obligations of Washington Mutual Bank are rated no lower than *"A"* by Fitch and the short-term unsecured debt obligations of Washington Mutual Bank are rated no lower than *"F1"* by Fitch and (iv) if Moody's is a Rating Agency as defined herein, the long-term unsecured debt obligations of Washington Mutual Bank are rated no lower than *"A2"* by Moody's and the short-term unsecured debt obligations of Washington Mutual Bank are rated no lower than *"P-1"* by Moody's; provided, that if the long-term or short-term unsecured debt obligations of Washington Mutual Bank are downgraded by any of the Rating Agencies to a rating lower than the applicable rating specified in this sentence, Washington Mutual Bank shall cease to be an *"Eligible Institution"* ten Business Days after notification of such downgrade.

*Eligible Investments*:  Any one or more of the obligations or securities listed below in which funds deposited in the Investment Account, the Certificate Account, the Custodial Account for P&I and the Custodial Account for Reserves may be invested:

(i)        Obligations of, or guaranteed as to principal and interest by, the United States of America or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States of America;

(ii)        Repurchase agreements on obligations described in clause (i) of this definition of *"Eligible Investments,"* provided that the unsecured obligations of the party (including the Trustee in its commercial capacity) agreeing to repurchase such obligations have at the time one of the two highest short term debt ratings of the Rating Agencies and provided that such repurchaser's unsecured long term debt has one of the two highest unsecured long term debt ratings of the Rating Agencies;

(iii)        Federal funds, certificates of deposit, time deposits and bankers' acceptances of any U.S. bank or trust company incorporated under the laws of the United States of America or any state (including the Trustee in its commercial capacity), provided that the debt obligations of such bank or trust company (or, in the case of the principal bank in a bank holding company system, debt obligations of the bank holding company) at the date of acquisition thereof have one of the two highest short term debt ratings of the Rating Agencies and unsecured long term debt has one of the two highest unsecured long term debt ratings of the Rating Agencies;

(iv)        Obligations of, or obligations guaranteed by, any state of the United States of America or the District of Columbia, provided that such obligations at the date of acquisition thereof shall have the highest long-term debt ratings available for such securities from the Rating Agencies;

(v)         Commercial paper of any corporation incorporated under the laws of the United States of America or any state thereof, which on the date of acquisition has the highest commercial paper rating of the Rating Agencies, provided that the corporation has unsecured long term debt that has one of the two highest unsecured long term debt ratings of the Rating Agencies;

(vi)        Securities (other than stripped bonds or stripped coupons) bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any state thereof and have the highest long-term unsecured rating available for such securities from the Rating Agencies; *provided, however,* that securities issued by any such corporation will not be investments to the extent that investment therein would cause the outstanding principal amount of securities issued by such corporation that are then held as part of the Investment Account or the Certificate Account to exceed 20% of the aggregate principal amount of all Eligible Investments then held in the Investment Account and the Certificate Account; and

(vii)        Units of taxable money market funds (which may be 12b-1 funds, as contemplated under the rules promulgated by the Securities and Exchange Commission under the Investment Company Act of 1940), which funds have the highest rating available for such securities from the Rating Agencies or which have been designated in writing by the Rating Agencies as Eligible Investments;

*provided, however*, that such obligation or security is held for a temporary period pursuant to Section 1.860G-2(g)(1) of the Treasury Regulations, and that such period can in no event exceed thirteen months.

In no event shall an instrument be an Eligible Investment if such instrument (a) evidences a right to receive only interest payments with respect to the obligations underlying such instrument or (b) has been purchased at a price greater than the outstanding principal balance of such instrument.

*ERISA*:  The Employee Retirement Income Security Act of 1974, as amended.

*ERISA Restricted Certificate*:  Any Senior Subordinate Certificate.

*Event of Default*:  Any event of default as specified in Section 7.01.

*Excess Liquidation Proceeds*:  With respect to any Distribution Date, the sum of (i) the excess, if any, of aggregate Liquidation Proceeds received during the Prior Period over the amount that would have been received if Payoffs had been made with respect to such Mortgage Loans on the date such Liquidation Proceeds were received and (ii) any Excess Subsequent Recoveries for such Distribution Date.

*Excess Subsequent Recoveries*:  For any Distribution Date, the excess, if any, of (i) amounts received by the Servicer during the Prior Period (after deduction of amounts reimbursable under Section 3.05(a)(i) and (ii)) in connection with the liquidation of defaulted Mortgage Loans after such Mortgage Loans became Liquidated Mortgage Loans over (ii) the Subsequent Recoveries for such Distribution Date.

*Fannie Mae*:  The entity formerly known as the Federal National Mortgage Association, or any successor thereto.

*FDIC*:  Federal Deposit Insurance Corporation, or any successor thereto.

*FHA*:  Federal Housing Administration, or any successor thereto.

*Final Maturity Date:*  With respect to each Class of the REMIC I and REMIC II Regular Interests and the Residual Interests, the date set forth in the applicable table contained in the Preliminary Statement hereto.  With respect to each Class of Class A, Class B and Class X Certificates, the date set forth for its Corresponding Class of REMIC II Regular Interests in the

applicable table contained in the Preliminary Statement hereto.

*Final Yield Maintenance Payment Date:* For the Class A Certificates, the Distribution Date in February 2014.

*Fitch:* Fitch Ratings, provided that at any time it be a Rating Agency.

*Freddie Mac:* The entity formerly known as the Federal Home Loan Mortgage Corporation, or any successor thereto.

*Index:* For each Mortgage Loan, One-Year MTA. For each Mortgage Loan and each Interest Rate Adjustment Date, the One-Year MTA figure used to calculate the Mortgage Interest Rate will be the most recent One-Year MTA figure available as of fifteen days before such Interest Rate Adjustment Date. In the event One-Year MTA (or a substitute index) is no longer available, the Servicer will select a substitute index in accordance with the Mortgage Note.

*Indirect DTC Participants:* Entities such as banks, brokers, dealers or trust companies, that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly.

*Initial Custodial Agreement:* The Custodial Agreement, dated the date hereof, among the Trustee, the Servicer and the Initial Custodian.

*Initial Custodian:* Washington Mutual Bank fsb, which has been designated by the Servicer to be appointed by the Trustee to act as Custodian.

*Insurance Proceeds:* Amounts paid or payable by the insurer under any Primary Insurance Policy or any other insurance policy (including any replacement policy permitted under this Agreement) covering any Mortgage Loan or Mortgaged Property, including, without limitation, any hazard insurance policy required pursuant to Section 3.07, any title insurance policy required pursuant to Section 2.08 and any FHA insurance policy or VA guaranty.

*Interest Distribution Amount:* For any Distribution Date for any Class of REMIC I Regular Interests, REMIC II Regular Interests and the Class R-1 Residual Interest, the amount of interest accrued during the Prior Period (or in the case of the Class A-L and Class B-L Regular Interests, during the No-Delay Accrual Period), at the related Certificate Interest Rate for such Class for such Distribution Date, on the respective Class Principal Balance or Class Notional Amount, as applicable, immediately before such Distribution Date, reduced by Net Negative Amortization Amounts, Uncompensated Interest Shortfall and the interest portion of Realized Losses allocated to such Class on such Distribution Date pursuant to the definitions of *"Net Negative Amortization Amount," "Uncompensated Interest Shortfall"* and *"Realized Loss,"* respectively.

The computation of interest accrued on the Class A-L Regular Interests shall be made on the basis of the actual number of days in the No-Delay Accrual Period and assuming a 360 day year.

The computation of interest accrued on the Class X-L and Class B-L Regular Interests and the Residual Interests shall be made on the basis of a 360-day year of twelve 30-day months. The interest accrual period for the Class X-L or Class B-L Regular Interests and the Residual Interests shall be deemed to consist of 30 days.

*Interest Rate Adjustment Date:* As to each Mortgage Loan, the initial Due Date on which an adjustment to the Mortgage Interest Rate of such Mortgage Loan becomes effective.

*Investment Account:* The commingled account (which shall be commingled only with investment accounts related to series of pass-through certificates with a class of certificates which has a rating equal to the highest of the Ratings of the Certificates) maintained by the Servicer in the trust department of the Investment Depository pursuant to Section 3.03 and which bears a designation acceptable to the Rating Agencies.

*Investment Depository:* JPMorgan Chase Bank, N.A. or another bank or trust company designated from time to time by the Servicer. The Investment Depository shall at all times be an Eligible Institution.

*Junior Subordinate Certificates:* The Class B-10, Class B-11, Class B-12 and Class B-13 Certificates.

*Last Scheduled Distribution Date:* With respect to any Class of Certificates, the Final Maturity Date for such Class.

*Lender:* An institution from which the Company purchased any Mortgage Loans.

*LIBOR:* The London Interbank Offered Rate for one-month United States dollar deposits calculated in the manner described in Section 3.19.

*LIBOR Determination Date:* With respect to interest paid on any Distribution Date, the second day on which banks in London and New York City are open for conducting transactions in foreign currency and exchange prior to the 25th day of the month preceding the Distribution Date.

*Liquidated Mortgage Loan:* A Mortgage Loan (other than a Mortgage Loan with respect to which a Payoff has been made) for which the Servicer has determined in accordance with its customary servicing practices that it has received all amounts which it expects to recover from or on account of such Mortgage Loan, whether from Insurance Proceeds, Liquidation Proceeds or otherwise. For purposes of this definition, acquisition of a Mortgaged Property by the Trust shall not constitute final liquidation of the related Mortgage Loan.

*Liquidation Principal:* The principal portion of Liquidation Proceeds received with respect to each Mortgage Loan which became a Liquidated Mortgage Loan (but not in excess of the principal balance thereof) during the Prior Period.

*Liquidation Proceeds:* Amounts after deduction of amounts reimbursable under Section 3.05(a)(i) and (ii) received and retained in connection with the liquidation of defaulted Mortgage Loans, whether through foreclosure or otherwise, other than any Subsequent Recoveries.

*Loan-to-Value Ratio:* The original principal amount of a Mortgage Loan divided by the Original Value; *provided, however,* that references to *"current Loan-to-Value Ratio"* or *"Loan-to-Value Ratio as of the Cut-Off Date"* in Section 2.08 shall be deemed to mean the then current Principal Balance of a Mortgage Loan divided by the Original Value.

*Lowest Class B Owner:* An owner unaffiliated with the Company or the Servicer of (i) a 100% interest in the Class of Class B Certificates with the lowest priority or (ii) a 100% interest in a class of securities representing such interest in such Class specified in clause (i) above.

*Marker Rate:* With respect to the Class X Certificates and any Distribution Date, in relation to the REMIC I Regular Interests LT1, LT2, LT3 and LT4, a per annum rate equal to two (2) times the weighted average of the Certificate Interest Rates for REMIC I Regular Interest LT2 and REMIC I Regular Interest LT3.

*MERS:* Mortgage Electronic Registration Systems, Inc., a Delaware corporation, or any successor thereto.

*MERS Loan*:  Any Mortgage Loan registered on the MERS® System for which MERS appears as the mortgagee of record on the Mortgage or on an assignment thereof.

*MERS® System*:  The system of electronically recording transfers of Mortgages maintained by MERS.

*MIN*:  The Mortgage Identification Number for a MERS Loan.

*MOM Loan*:  A Mortgage Loan that was registered on the MERS® System at the time of origination thereof and for which MERS appears as the mortgagee of record on the Mortgage.

*Minimum Monthly Payment*:  For each Mortgage Loan, the scheduled payment of interest or principal and interest due on a Mortgage Loan (which payment may be less than the amount of interest accrued on such Mortgage Loan due to the related Monthly Payment Adjustment Terms) (including any amounts due from a Buydown Fund, if any) on the related Due Date for such Mortgage Loan.

*Monthly P&I Advance*:  An advance of funds by the Servicer pursuant to Section 4.02 to cover delinquent principal and interest installments.

*Monthly Payment Adjustment Terms:*  As to each Mortgage Loan, the terms for adjusting the amount of the Minimum Monthly Payment on such Mortgage Loan, as set forth in the related Mortgage Note, including the dates on which or the circumstances under which such adjustments become effective and limitations on the amounts of such adjustments.

*Moody's*:  Moody's Investors Service, Inc., provided that at any time it be a Rating Agency.

*Mortgage*:  The mortgage, deed of trust or other instrument securing a Mortgage Note.

*Mortgage File*:  The following documents or instruments with respect to each Mortgage Loan transferred and assigned by the Company pursuant to Section 2.04, (X) with respect to each Mortgage Loan that is not a Cooperative Loan:

(i)       The original Mortgage Note endorsed (A) in blank, without recourse, or (B) to *"Deutsche Bank National Trust Company, as Trustee, without recourse"* or to *"WaMu Mortgage Pass-Through Certificates Series 2005-AR11 Trust, without recourse"* and all intervening endorsements evidencing a complete chain of endorsements from the originator to the Trustee or the Trust, as applicable, or, in the event of any Destroyed Mortgage Note, a copy or a duplicate original of the Mortgage Note, together with an original lost note affidavit from the originator of the Mortgage Loan or the Company (or any affiliate of the Company from which the Company acquired the Mortgage Loan), as applicable, stating that the original Mortgage Note (or portion thereof, as applicable) was lost, misplaced or destroyed, together with a copy of the Mortgage Note; *provided, however,* that in the event the Company acquired the Mortgage Loan from an affiliate of the Company, then the Mortgage Note need not be endorsed in blank or to Deutsche Bank National Trust Company or the Trust as provided above (but, if not so endorsed, shall be made payable to, or endorsed by the mortgagee named therein to, such affiliate of the Company);

(ii)      The Buydown Agreement, if applicable;

(iii)     A Mortgage that is either

(1)       (x) the original recorded Mortgage with evidence of recording thereon for the jurisdiction in which the Mortgaged Property is located (which original recorded Mortgage, in the case of a MOM Loan, shall set forth the MIN and shall indicate that the Mortgage Loan is a MOM Loan), (y) unless the Mortgage Loan is a MERS Loan, an original Mortgage assignment thereof duly executed and acknowledged in recordable form (A) in blank or (B) to *"Deutsche Bank National Trust Company, as Trustee,"* or to *"WaMu Mortgage Pass-Through Certificates Series 2005-AR11 Trust,"* and (z) unless the Mortgage Loan is a MOM Loan, recorded originals of all intervening assignments evidencing a complete chain of assignment, from the originator to the name holder or the payee endorsing the related Mortgage Note (or, in the case of a MERS Loan other than a MOM Loan, from the originator to MERS); or

(2)       (x) a copy (which may be in electronic form) of the Mortgage (which Mortgage, in the case of a MOM Loan, shall set forth the MIN and shall indicate that the Mortgage Loan is a MOM Loan) which represents a true and correct reproduction of the original Mortgage and which has either been certified (i) on the face thereof by the public recording office in the appropriate jurisdiction in which the Mortgaged Property is located, or (ii) by the originator, the related Lender, the Servicer or the escrow or title company which provided closing services in connection with such Mortgage Loan as a true and correct copy the original of which has been sent for recordation, (y) unless the Mortgage Loan is a MERS Loan, an original Mortgage assignment thereof duly executed and acknowledged in recordable form (A) in blank or (B) to *"Deutsche Bank National Trust Company, as Trustee,"* or to *"WaMu Mortgage Pass-Through Certificates Series 2005-AR11 Trust"* and (z) unless the Mortgage Loan is a MOM Loan, true and correct copies, certified by the applicable county recorder or by the originator, Lender or Servicer as described above, of all intervening assignments evidencing a complete chain of assignment from the originator to the name holder or the payee endorsing the related Mortgage Note (or, in the case of a MERS Loan other than a MOM Loan, from the originator to MERS);

provided, however, that in the event the Company acquired the Mortgage Loan from an affiliate of the Company, then the Mortgage File need not include a Mortgage assignment executed in blank or to Deutsche Bank National Trust Company or the Trust as provided in clause (X)(iii)(1)(y) or (X)(iii)(2)(y) above, as applicable (but the Mortgage File shall, unless the Mortgage Loan was originated by such affiliate of the Company, include an intervening Mortgage assignment to such affiliate as provided in clause (X)(iii)(1)(z) or (X)(iii)(2)(z) above, as applicable); and

(iv)      For any Mortgage Loan that has been modified or amended, the original instrument or instruments effecting such modification or amendment;

and (Y) with respect to each Cooperative Loan:

(i)       The original Mortgage Note endorsed (A) in blank, without recourse, or (B) to *"Deutsche Bank National Trust Company, as Trustee, without recourse"* or to *"WaMu Mortgage Pass-Through Certificates Series 2005-AR11 Trust, without recourse"* and all intervening endorsements evidencing a complete chain of endorsements, from the originator to the Trustee or the Trust, as applicable, or, in the event of any Destroyed Mortgage Note, a copy or a duplicate original of the Mortgage Note, together with an original lost note affidavit from the originator of the Cooperative Loan or the Company (or any affiliate of the Company from which the Company acquired the Mortgage Loan), as applicable, stating that the original Mortgage Note (or portion thereof, as applicable) was lost, misplaced or destroyed, together with a copy of the Mortgage Note; *provided, however,* that in the event the Company acquired the Cooperative Loan from an affiliate of the Company, then the Mortgage Note need not be endorsed in blank or to Deutsche Bank National Trust Company or the Trust as provided above (but, if not so endorsed, shall be made payable to, or endorsed by the originator or successor lender named therein to, such affiliate of the Company);

(ii)      A counterpart of the Cooperative Lease and the Assignment of Proprietary Lease to the originator of the Cooperative Loan;

(iii)     The related Cooperative Stock Certificate, representing the related Cooperative Stock pledged with respect to such Cooperative Loan, together with an undated stock power (or other similar instrument) executed in blank;

(iv)     The Recognition Agreement;

(v)     The Security Agreement;

(vi)     Copies of the original UCC financing statement, and any continuation statements, filed by the originator of such Cooperative Loan as secured party, each with evidence of recording thereof, evidencing the interest of the originator under the Security Agreement and the Assignment of Proprietary Lease;

(vii)     Copies of the filed UCC assignments or amendments of the UCC financing statement referenced in clause (vi) above showing an unbroken chain of title from the originator to the Trust, each with evidence of recording thereof, evidencing the interest of the assignee under the Security Agreement and the Assignment of Proprietary Lease;

(viii)     An executed assignment of the interest of the originator in the Security Agreement, the Assignment of Proprietary Lease and the Recognition Agreement, showing an unbroken chain of title from the originator to the Trust; and

(ix)     For any Cooperative Loan that has been modified or amended, the original instrument or instruments effecting such modification or amendment;

provided, however, that in the event the Company acquired the Cooperative Loan from an affiliate of the Company, then the Mortgage File need not include (1) a UCC assignment or amendment of the UCC financing statement referenced in clause (Y)(vi) above to the Trust as provided in clause (Y)(vii) above (but the Mortgage File shall, unless the Cooperative Loan was originated by such affiliate of the Company, include a UCC assignment or amendment of such UCC financing statement to such affiliate) or (2) an assignment of the interest of the originator in the Security Agreement, the Assignment of Proprietary Lease and the Recognition Agreement to the Trust as provided in clause (Y)(viii) above (but the Mortgage File shall, unless the Cooperative Loan was originated by such affiliate of the Company, include an assignment of such interest to such affiliate).

Mortgage Interest Rate:  For any Mortgage Loan, the per annum rate at which interest accrues on such Mortgage Loan pursuant to the terms of the related Mortgage Note.

Mortgage Loan Margin:  For each Mortgage Loan, the applicable fixed per annum percentage rate specified in the applicable Mortgage Note and designated as such in the Mortgage Loan Schedule; provided, however, that in the event the Index is replaced, the Mortgage Loan Margin will be increased or decreased pursuant to the related Mortgage Note.

Mortgage Loan Schedule:  The schedule, as amended from time to time, of Mortgage Loans attached hereto as Exhibit D, which shall set forth as to each Mortgage Loan the following, among other things:

(i)     its loan number,

(ii)     the city, state and zip code of the Mortgaged Property,

(iii)     the Minimum Monthly Payment as of the Cut-Off Date,

(iv)     the Original Value of the property subject to the Mortgage,

(v)     the Principal Balance as of the Cut-Off Date,

(vi)     the Mortgage Interest Rate, as of the Cut-Off Date, borne by the Mortgage Note and the Rate Ceiling and Mortgage Loan Margin borne by the Mortgage Note, and the Index, Interest Rate Adjustment Date and Monthly Payment Adjustment Terms applicable to such Mortgage Loan,

(vii)     whether a Primary Insurance Policy is in effect as of the Cut-Off Date, and, if so, whether such Primary Insurance Policy is a Special Primary Insurance Policy,

(viii)     the maturity of the Mortgage Note and

(ix)     the Servicing Fee Rate.

If the Trust issues one or more Classes of Certificates which are backed, in whole or in part, by the distribution of Assigned Prepayment Premiums, a schedule will be prepared by the Company setting forth as to each Mortgage Loan, as of the Cut-Off Date, the applicable term during which a Prepayment Premium, if any, may be imposed on such Mortgage Loan and such schedule will be deemed to be incorporated into this definition of Mortgage Loan Schedule.

Mortgage Loans:  The mortgage loans and cooperative loans (if any) listed on the Mortgage Loan Schedule and transferred and assigned to the Trust pursuant hereto. With respect to each Mortgage Loan that is a Cooperative Loan, "Mortgage Loan" shall include, but not be limited to, the Mortgage Note, Security Agreement, Assignment of Proprietary Lease, Recognition Agreement, Cooperative Stock Certificate and Cooperative Lease, and, with respect to each Mortgage Loan other than a Cooperative Loan, "Mortgage Loan" shall include, but not be limited to the Mortgage Note and the related Mortgage.

Mortgage Note:  The note or other evidence of the indebtedness of a Mortgagor under a Mortgage Loan.

Mortgage Pool:  All of the Mortgage Loans.

Mortgage Pool Assets:  (i) The Mortgage Loans (including all Substitute Mortgage Loans) identified on the Mortgage Loan Schedule, and all rights pertaining thereto, including the related Mortgage Notes, Mortgages, Cooperative Stock Certificates, Cooperative Leases, Security Agreements, Assignments of Proprietary Lease, and Recognition Agreements, and all payments and distributions with respect to the Mortgage Loans payable on and after the Cut-Off Date; (ii) the Certificate Account, the Investment Account, and all money, instruments, investment property, and other property credited thereto, carried therein, or deposited therein (except amounts constituting the Servicing Fee); (iii) the Custodial Accounts for P&I, the Custodial Accounts for Reserves, any Buydown Fund Account (to the extent of the amounts on deposit or other property therein attributable to the Mortgage Loans), and all money, instruments, investment property, and other property credited thereto, carried therein, or deposited therein (except amounts constituting the Servicing Fee); (iv) all property that secured a Mortgage Loan and that has been acquired by foreclosure or deed in lieu of foreclosure or, in the case of a Cooperative Loan, a similar form of conversion, after the Cut-Off Date; (v) each FHA insurance policy, Primary Insurance Policy, VA guaranty, and other insurance policy related to any Mortgage Loan, and all amounts paid or payable thereunder and all proceeds thereof; and (vi) the Yield Maintenance Agreement.

Mortgaged Property:  With respect to any Mortgage Loan, other than a Cooperative Loan, the real property, together with improvements thereto, and, with respect to any Cooperative Loan, the related Cooperative Stock and Cooperative Lease, securing the indebtedness of the Mortgagor under the related Mortgage Loan.  "Mortgaged Property" shall also refer to property which

once secured the indebtedness of a Mortgagor under the related Mortgage Loan but which was acquired by the Trust upon foreclosure or other liquidation of such Mortgage Loan.

*Mortgagor*:  The obligor on a Mortgage Note.

*Negative Amortization Amount*:  For any Due Date for any Mortgage Loan, the excess, if any, of (i) the amount of interest accrued on such Mortgage Loan, during the monthly period immediately preceding such Due Date, at the related Mortgage Interest Rate, over the Minimum Monthly Payment due on such Mortgage Loan on such Due Date.

*Net Negative Amortization Amount*:  For any Distribution Date, the excess, if any, of (i) the aggregate of Negative Amortization Amounts with respect to the Mortgage Loans for the Due Date in the calendar month of such Distribution Date over (ii) the sum of (a) Curtailments received during the Prior Period from the Mortgage Loans and (b) Payoffs received during the Payoff Period from the Mortgage Loans.

For any Distribution Date, (a) the Net Negative Amortization Amount for such Distribution Date shall be allocated, first, to the Class LT2, LT3 and LT4 REMIC I Regular Interests respectively to the extent that their Principal Reduction Amounts for such Distribution Date are negative and, second, to the Class LT1 REMIC I Regular Interests to the extent of any remaining Net Deferred Interest, in reduction of the Interest Distribution Amount for such Classes, and (b) the Class Principal Balance of each such Class of REMIC I Regular Interest shall be increased by the Net Negative Amortization Amount allocated thereto for such Distribution Date.

For any Distribution Date, (a) the Net Negative Amortization Amount for such Distribution Date shall be allocated (i) first, to the Class X-L Regular Interest in an amount equal to the amount of interest accrued during the Prior Period on the Class X-L Notional Amount at the applicable Certificate Interest Rate for such Class and (ii) second, among the REMIC II Regular Interests (other than the Class X-L Regular Interest) in proportion to the excess, if any, for each such Class of (x) the amount of interest accrued during the No-Delay Accrual Period on the Class Principal Balance for such Class at the applicable Certificate Interest Rate for such Class, over (y) the amount of interest that would have accrued during the No-Delay Accrual Period on the Class Principal Balance for such Class had the Certificate Interest Rate for such Class equaled the Adjusted Cap Rate for such Class and for such Distribution Date, in reduction of the Interest Distribution Amount for each such Class, and (b) the Class Principal Balance for each Class of REMIC II Regular Interests shall be increased by the amount allocated to such Class in reduction of the Interest Distribution Amount thereof pursuant to clause (a) of this sentence.  The portion of the Net Negative Amortization Amount allocated to the Class X-L Regular Interest pursuant to the preceding sentence will be added to the outstanding principal balance of the Class X PO Component.

*No-Delay Accrual Period*:  For any Distribution Date, the period beginning on the 25th day of the month preceding that Distribution Date (or, in the case of the first Distribution Date, on the Closing Date) and ending on the 24th day of the month of that Distribution Date.

*Nonrecoverable Advance*:  With respect to any Mortgage Loan, any advance which the Servicer shall determine to be a Nonrecoverable Advance pursuant to Section 4.03 and which was, or is proposed to be, made by the Servicer.

*Non-U.S. Person*:  A Person that is not a U.S. Person.

*Notice Addresses*:  (a) In the case of the Company, 75 North Fairway Drive, Vernon Hills, Illinois 60061, Attention: Servicing Department, with a copy to: Washington Mutual Legal Department, 1201 Third Avenue, WMT 1706, Seattle, WA 98101, Attention: WMMSC, or such other address as may hereafter be furnished to the Trustee in writing by the Company, (b) in the case of the Servicer, 19850 Plummer Street (Mail Stop N070205), Chatsworth, CA 91311, Fax Number (818) 775-2815, Attention:  Vice President Investor Reporting, with a copy to: Washington Mutual Legal Department, 1201 Third Avenue, WMT 1706, Seattle, WA 98101, Fax Number (206) 377-6244, Attention: WaMu, and with a copy to the Company (at the Notice Address specified in clause (a) above), or such other address and fax number as may hereafter be furnished in writing by the Servicer, (c) in the case of the Trustee, at its Corporate Trust Office, or such other address as may hereafter be furnished to the Servicer in writing by the Trustee, (d) in the case of the Delaware Trustee, 1011 Centre Road, Suite 200, Wilmington, DE 19805-1266, or such other address as may hereafter be furnished to the Servicer in writing by the Delaware Trustee, (e) in the case of the Trust, c/o Deutsche Bank National Trust Company, at the Corporate Trust Office, or such other address as may hereafter be furnished to the Servicer in writing by the Trustee, (f) in the case of the Certificate Registrar, at its Corporate Trust Office, or such other address as may hereafter be furnished to the Trustee in writing by the Certificate Registrar, (g) in the case of S&P, 55 Water Street, 41st Floor, New York, NY 10041-0003, Attention:  Residential Mortgage Backed Securities Surveillance Group, or such other address as may hereafter be furnished to the Trustee and Servicer in writing by S&P and (h) in the case of Moody's, 99 Church Street, New York, NY 10007, Attention: Monitoring, or such other address as may hereafter be furnished to the Trustee and Servicer in writing by Moody's.

*OTS*:  The Office of Thrift Supervision, or any successor thereto.

*Officer's Certificate*:  A certificate signed by the Chairman of the Board, the President, a Vice President, or the Treasurer of the Servicer and delivered to the Trustee or the Delaware Trustee, as applicable.

*One-Year MTA*:  The twelve-month moving average monthly yield on United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release *"Selected Interest Rates (H.15),"* determined by averaging the monthly yields for the most recently available twelve months.

*Opinion of Counsel*:  A written opinion of counsel, who shall be reasonably acceptable to the Trustee or the Delaware Trustee, as applicable, and who may be counsel (including in-house counsel) for the Company or the Servicer.

*Original Trust Agreement*:  The Trust Agreement, dated as of August 1, 2005, between the Company and the Delaware Trustee, providing for the creation of the Trust.

*Original Value*:  With respect to any Mortgage Loan other than a Mortgage Loan originated for the purpose of refinancing an existing mortgage debt, the lesser of (a) the Appraised Value (if any) of the Mortgaged Property at the time the Mortgage Loan was originated or (b) the purchase price paid for the Mortgaged Property by the Mortgagor.  With respect to a Mortgage Loan originated for the purpose of refinancing existing mortgage debt, the Original Value shall be equal to the Appraised Value of the Mortgaged Property.

*Ownership Interest*:  With respect to any Residual Certificate, any ownership or security interest in such Residual Certificate, including any interest in a Residual Certificate as the Holder thereof and any other interest therein whether direct or indirect, legal or beneficial, as owner or as pledgee.

*Pass-Through Entity*:  Any regulated investment company, real estate investment trust, common trust fund, partnership, trust or estate, and any organization to which Section 1381 of the Code applies.

*Pass-Through Rate*:  For each Mortgage Loan, the Mortgage Interest Rate for such Mortgage Loan less (i) the Servicing Fee Rate for such Mortgage Loan and (ii) if such Mortgage Loan was covered by a Special Primary Insurance Policy on the Closing Date (even if no longer so covered), the per annum rate at which the applicable Special Primary Insurance Premium for such Mortgage Loan is calculated. For each Mortgage Loan, any calculation of monthly interest at such rate shall be based upon annual interest at such rate (computed on the basis of a 360-day year of twelve 30-day months) on the unpaid Principal Balance of such Mortgage Loan divided by twelve, and any calculation of interest at such rate by reason of a Payoff shall be based upon annual interest at such rate on the outstanding Principal Balance of such Mortgage Loan multiplied by a fraction, the numerator of which is the number of days elapsed from the Due Date of the last scheduled payment of principal and interest to, but not including, the date of such Payoff, and the denominator of which is (a) for Payoffs received on a Due Date, 360, and (b) for all other Payoffs, 365.

*Paying Agent*:  Any paying agent appointed by the Trustee pursuant to Section 8.12.

*Payoff*:  Any Mortgagor payment of principal on a Mortgage Loan equal to the entire outstanding Principal Balance of such Mortgage Loan, if received in advance of the last scheduled Due Date for such Mortgage Loan and accompanied by an amount of interest equal to accrued unpaid interest on the Mortgage Loan to the date of such payment-in-full.  (Prepayment penalties are not payments of principal and hence Payoffs do not include prepayment penalties.)

*Payoff Earnings*:  For any Distribution Date with respect to each Mortgage Loan on which a Payoff was received by the Servicer during the Payoff Period, the aggregate of the interest earned by the Servicer from investment of each such Payoff from the date of receipt of such Payoff until the Business Day immediately preceding the related Distribution Date (net of investment losses).

*Payoff Interest*:  For any Distribution Date with respect to a Mortgage Loan for which a Payoff was received on or after the first calendar day of the month of such Distribution Date and before the 15th calendar day of such month, an amount of interest thereon at the applicable Pass-Through Rate from the first day of the month of distribution through the day of receipt thereof; to the extent (together with aggregate Payoff Earnings and the aggregate Servicing Fee) not required to be distributed as Compensating Interest on such Distribution Date, aggregate Payoff Interest shall be payable to the Servicer as additional servicing compensation.

*Payoff Period*:  For the first Distribution Date, the period from the Cut-Off Date through August 14, 2005, inclusive; and for any Distribution Date thereafter, the period from the 15th day of the Prior Period through the 14th day of the month of such Distribution Date, inclusive.

*Percentage Interest*:  (a)  With respect to the right of each Certificate of a particular Class in the distributions allocated to such Class, *"Percentage Interest"* shall mean the percentage equal to:

(i)        with respect to any Certificate (other than the Class X and Residual Certificates), its Certificate Principal Balance divided by the applicable Class Principal Balance;

(ii)        with respect to any Class X Certificate, the portion of the Class X-L Notional Amount evidenced by such Certificate divided by the Class X-L Notional Amount; and

(iii)        with respect to any Residual Certificate, the percentage set forth on the face of such Certificate.

(b)        With respect to the rights of each Certificate in connection with Sections 5.09, 7.01, 8.01(c), 8.02, 8.07, 10.01 and 10.03, *"Percentage Interest"* shall mean the percentage equal to:

(i)        with respect to any Certificate (other than the Class X and Residual Certificates), the product of (x) ninety-nine percent (99%) and (y) its Certificate Principal Balance divided by the Aggregate Certificate Principal Balance of the Certificates; *provided, however,* that the percentage in clause (x) above shall be increased by one percent (1%) upon the retirement of the Class X Certificates;

(ii)        with respect to any Class X Certificate, one percent (1%) of such Certificate's Percentage Interest as calculated by paragraph (a)(ii) of this definition; and

(iii)        with respect to any Residual Certificate, zero.

*Permitted Transferee*:  With respect to the holding or ownership of any Residual Certificate, any Person other than (i) the United States, a State or any political subdivision thereof, or any agency or instrumentality of any of the foregoing, (ii) a foreign government, International Organization or any agency or instrumentality of either of the foregoing, (iii) an organization (except certain farmers' cooperatives described in Code Section 521) which is exempt from the taxes imposed by Chapter 1 of the Code (unless such organization is subject to the tax imposed by Section 511 of the Code on unrelated business taxable income), (iv) rural electric and telephone cooperatives described in Code Section 1381(a)(2)(C), (v) any *"electing large partnership"* as defined in Section 775(a) of the Code, (vi) any Person from whom the Trustee has not received an affidavit to the effect that it is not a *"disqualified organization"* within the meaning of Section 860E(e)(5) of the Code, and (vii) any other Person so designated by the Company based upon an Opinion of Counsel that the transfer of an Ownership Interest in a Residual Certificate to such Person may cause REMIC I or REMIC II to fail to qualify as a REMIC at any time that the Certificates are outstanding. The terms *"United States," "State"* and *"International Organization"* shall have the meanings set forth in Code Section 7701 or successor provisions. A corporation shall not be treated as an instrumentality of the United States or of any State or political subdivision thereof if all of its activities are subject to tax, and, with the exception of the Freddie Mac, a majority of its board of directors is not selected by such governmental unit.

*Person*:  Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

*Prepaid Monthly Payment*:  Any Minimum Monthly Payment received prior to its scheduled Due Date, which is intended to be applied to a Mortgage Loan on its scheduled Due Date and held in the related Custodial Account for P&I until the Withdrawal Date following its scheduled Due Date.

*Prepayment Premium*:  With respect to any Mortgage Loan, any fee or premium required to be paid by the Mortgagor if the Mortgagor voluntarily prepays such Mortgage Loan in full as provided in the related Mortgage Note or Mortgage and which is not waived by the Servicer.

*Primary Insurance Policy*:  A policy of mortgage guaranty insurance, if any, on an individual Mortgage Loan or on pools of mortgage loans that include an individual Mortgage Loan, providing coverage as required by Section 2.08(xi) (including any Special Primary Insurance Policy).

*Principal Balance*:  Except as used in Sections 2.07, 3.09 and 9.01 and for purposes of the definition of Purchase Price, at the time of any determination, the principal balance of a Mortgage Loan remaining to be paid at the close of business on the Cut-Off Date, after application of all scheduled principal payments due on or before the Cut-Off Date, whether or not received, reduced by all amounts distributed or (except when such determination occurs earlier in the month than the Distribution Date) to be distributed to Certificateholders through the Distribution Date in the month of determination that are reported as allocable to principal of such Mortgage Loan, and increased by all Negative Amortization Amounts for such Mortgage Loan for prior Due Dates.

For purposes of the definition of Purchase Price and as used in Sections 2.07, 3.09 and 9.01, at the time of any determination, the principal balance of a Mortgage Loan remaining to be paid at the close of business on the Cut-Off Date, after deduction of all scheduled principal payments due on or before the Cut-Off Date, whether or not received, reduced by all amounts distributed or to be distributed to Certificateholders (other than the price paid by the Servicer in connection with a purchase by the Servicer of the Mortgage Loans pursuant to Section 9.01) through the Distribution Date in the month of determination that are reported as allocable to principal of such Mortgage Loan, and increased by all Negative Amortization Amounts for such Mortgage Loan for prior Due Dates.

In the case of a Substitute Mortgage Loan, *"Principal Balance"* shall mean, at the time of any determination, the principal balance of such Substitute Mortgage Loan transferred to the Trust, on the date of substitution, reduced by all amounts distributed or to be distributed to Certificateholders through the Distribution Date in the month of determination that are reported as allocable to principal of such Substitute Mortgage Loan, and increased by all Negative Amortization Amounts for such Substitute Mortgage Loan for prior Due Dates since the date of substitution.

The Principal Balance of a Mortgage Loan (including a Substitute Mortgage Loan) shall not be adjusted solely by reason of any bankruptcy or similar proceeding or any moratorium or similar waiver or grace period. Whenever a Realized Loss has been incurred with respect to a Mortgage Loan during a calendar month, the Principal Balance of such Mortgage Loan shall be reduced by the amount of such Realized Loss as of the Due Date next following the end of such calendar month. The Principal Balance of each Mortgage Loan shall be increased, as of each Due Date, by the amount of any Negative Amortization Amount for such Mortgage Loan for such Due Date.

*Principal Payment*:  Any payment of principal on a Mortgage Loan other than a Principal Prepayment.

*Principal Payment Amount*:  For any Distribution Date, the sum of (i) the scheduled principal payments (if any) on the Mortgage Loans due on the related Due Date, (ii) the principal portion of proceeds received with respect to any Mortgage Loan which was purchased or repurchased pursuant to a Purchase Obligation or as permitted by this Agreement during the Prior Period and (iii) any other unscheduled payments of principal which were received with respect to any Mortgage Loan during the Prior Period, other than Payoffs, Curtailments, Liquidation Principal and Subsequent Recoveries.

*Principal Prepayment*:  Any payment of principal on a Mortgage Loan which constitutes a Payoff or a Curtailment.

*Principal Prepayment Amount*:  For any Distribution Date, the sum of (i) Curtailments received during the Prior Period from the Mortgage Loans and (ii) Payoffs received during the Payoff Period from the Mortgage Loans, such sum reduced (but not to less than zero) by the aggregate of Negative Amortization Amounts with respect to the Mortgage Loans for the Due Date in the calendar month of such Distribution Date.

*Prior Period*:  With respect to any Distribution Date, the calendar month immediately preceding such Distribution Date.

*Pro Rata Allocation*:  The allocation of the principal portion of Realized Losses to all Classes of REMIC II Regular Interests pro rata according to their respective Class Principal Balances in reduction thereof, and the allocation of the interest portion of Realized Losses to all Classes of REMIC II Regular Interests pro rata according to the amount of interest accrued but unpaid on each such Class, in reduction thereof, and then to such Classes pro rata according to their respective Class Principal Balances in reduction thereof.

*Prospectus*:  The Prospectus, dated July 13, 2005, and the Prospectus Supplement, dated August 23, 2005, of the Company.

*Purchase Obligation*:  An obligation of the Company to repurchase Mortgage Loans under the circumstances and in the manner provided in Section 2.07 or Section 2.08.

*Purchase Price*:  With respect to any Mortgage Loan to be purchased pursuant to a Purchase Obligation, an amount equal to the sum of (i) the Principal Balance thereof, (ii) unpaid accrued interest thereon, if any, during the calendar month in which the date of purchase occurs to the last day of such month at a rate equal to the applicable Pass-Through Rate and (iii) any costs and damages incurred by the Trust in connection with any violation by such Mortgage Loan of any predatory and abusive lending laws, to the extent such costs and damages result from a breach of the representation and warranty made by the Company pursuant to clause (viii) of Section 2.08; *provided, however,* that to the extent that such costs and damages constitute a set-off against the principal balance of the Mortgage Loan, such costs and damages will not be paid pursuant to this clause (iii), and the amount paid pursuant to clause (i) above will be calculated without regard to such set-off; *provided, further,* that no Mortgage Loan shall be purchased or required to be purchased pursuant to Section 2.08, or more than two years after the Closing Date under Section 2.07, unless (a) the Mortgage Loan to be purchased is in default, or default is in the judgment of the Company reasonably imminent, or (b) the Company, at its expense, delivers to the Trustee an Opinion of Counsel addressed to the Trust and the Trustee to the effect that the purchase of such Mortgage Loan will not give rise to a tax on a prohibited transaction, as defined in Section 860F(a) of the Code.

*Qualified Insurer*:  A mortgage guaranty insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located if such qualification is necessary to issue the applicable insurance policy or bond, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided by the Primary Insurance Policies and approved as an insurer by the Servicer. A Qualified Insurer must have the rating required by the Rating Agencies.

*Rate Ceiling*:  The maximum per annum Mortgage Interest Rate permitted under the related Mortgage Note.

*Rating Agency*:  Initially, each of S&P and Moody's and thereafter, each nationally recognized statistical rating organization that has rated the Certificates at the request of the Company, or their respective successors in interest.

*Ratings*:  As of any date of determination, the ratings, if any, of the Certificates as assigned by the applicable Rating Agencies.

*Realized Loss*:  For any Distribution Date, with respect to any Mortgage Loan that became a Liquidated Mortgage Loan during the related Prior Period, the sum of (A) the excess, if any, of (i) accrued and unpaid interest on such Mortgage Loan over (ii) the aggregate Insurance Proceeds and Liquidation Proceeds received with respect to such Mortgage Loan (the interest portion of such Realized Loss) and (B) the excess, if any, of (i) the sum of (a) the Principal Balance of such Mortgage Loan and (b) the aggregate amount of Monthly P&I Advances (other than advances of delinquent interest) and any other advances made hereunder by the Servicer with respect to such Mortgage Loan, to the extent not previously reimbursed, over (ii) the aggregate Insurance Proceeds and Liquidation Proceeds received with respect to such Mortgage Loan (the amount in this clause (B)(ii) reduced by the amount in clause (A)(i) above) (the principal portion of such Realized Loss); *provided, however,* that for purposes of allocating Realized Losses to the REMIC I and REMIC II Regular Interests pursuant to this definition of *"Realized Loss,"* the aggregate principal portion of Realized Losses for any Distribution Date shall be reduced by the Cumulative Carry-Forward Subsequent Recoveries Amount for such Distribution Date. For any Distribution Date, with respect to any Mortgage Loan that is not a Liquidated Mortgage Loan, the amount of the Bankruptcy Loss for such Mortgage Loan and such Distribution Date.

Realized Losses shall be allocated among the REMIC I Regular Interests as follows:  The interest portion of Realized Losses, if any, shall be allocated among the Class LT1, Class LT2, Class LT3 and Class LT4  Regular Interests pro rata according to the amount of interest accrued but unpaid thereon, in reduction thereof.  Any interest portion of Realized Losses in excess of the amount allocated pursuant to the preceding sentence shall be treated as a principal portion of Realized Losses and allocated pursuant to the succeeding sentence.  The principal portion of Realized Losses, if any, shall be allocated (a) first, to the Class LT2, Class LT3 and Class LT4 Regular Interests, pro rata according to the Principal Reduction Amount thereof, to the extent of such Principal Reduction Amount in reduction of the Class Principal Balance of such Regular Interest, (b) second, to the Class LT1 Regular Interest, in reduction of the Class Principal Balance thereof, and (c) third, to the Class LT2, Class LT3 and Class LT4 Regular Interests, pro rata according to the Class Principal Balance thereof remaining after the application of clause (a) above, in reduction thereof.

Realized Losses shall be allocated among the REMIC II Regular Interests (i) for Realized Losses allocable to principal (a) first, to the Class B-13-L Regular Interest, until the Class B-13-L Principal Balance has been reduced to zero, (b) second, to the Class B-12-L Regular Interest, until the Class B-12-L Principal Balance has been reduced to zero, (c) third, to the Class B-11-L Regular Interest, until the Class B-11-L Principal Balance has been reduced to zero, (d) fourth, to the Class B-10-L Regular Interest, until the Class B-10-L Principal Balance has been reduced to zero, (e) fifth, to the Class B-9-L Regular Interest, until the Class B-9-L Principal Balance has been reduced to zero, (f) sixth, to the Class B-8-L Regular Interest, until the Class B-8-L Principal Balance has been reduced to zero, (g) seventh, to the Class B-7-L Regular Interest, until the Class B-7-L Principal Balance has been reduced to zero, (h) eighth, to the Class B-6-L Regular Interest, until the Class B-6-L Principal Balance has been reduced to zero, (i) ninth, to the Class B-5-L Regular Interest, until the Class B-5-L Principal Balance has been reduced to zero, (j) tenth, to the Class B-4-L Regular Interest, until the Class B-4-L Principal Balance has been reduced to zero, (k) eleventh, to the Class B-3-L Regular Interest, until the Class B-3-L Principal Balance has been reduced to zero, (l) twelfth, to the Class B-2-L Regular Interest, until the Class B-2-L Principal Balance has been reduced to zero and (m) thirteenth, to the Class B-1-L Regular Interest, until the Class B-1-L Principal Balance has been reduced to zero and (n) fourteenth, to the Class A-L and Class X-L Regular Interests, pro rata according to the Class

Principal Balances thereof, in reduction thereof; and (ii) for Realized Losses allocable to interest (a) first, to the Class B-13-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-13-L Principal Balance, (b) second, to the Class B-12-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-12-L Principal Balance, (c) third, to the Class B-11-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-11-L Principal Balance, (d) fourth, to the Class B-10-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-10-L Principal Balance, (e) fifth, to the Class B-9-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-9-L Principal Balance, (f) sixth, to the Class B-8-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-8-L Principal Balance, (g) seventh, to the Class B-7-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-7-L Principal Balance, (h) eighth, to the Class B-6-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-6-L Principal Balance, (i) ninth, to the Class B-5-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-5-L Principal Balance, (j) tenth, to the Class B-4-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-4-L Principal Balance, (k) eleventh, to the Class B-3-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-3-L Principal Balance, (l) twelfth, to the Class B-2-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-2-L Principal Balance (m) thirteenth, to the Class B-1-L Regular Interest, in reduction of accrued but unpaid interest thereon and then in reduction of the Class B-1-L Principal Balance and (n) fourteenth, to the Class A-L and Class X-L Regular Interests, pro rata according to accrued but unpaid interest on such Classes, in reduction thereof, and then to such Classes, pro rata according to the Class Principal Balances thereof, in reduction thereof; *provided, however*, that all principal losses that would otherwise be allocated to the Class A-1A-L Regular Interest pursuant to clause (i) of this paragraph shall instead (1) first be allocated to the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Regular Interests, pro rata, in reduction of the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Principal Balances, respectively, until each of the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L or Class A-1C4-L Principal Balance has been reduced to zero and (2) second, be allocated to the Class A-1B1-L, Class A-1B2-L and Class A-1B3-L Regular Interests, pro rata, in reduction of the Class A-1B1-L, Class A-1B2-L and Class A-1B3-L Principal Balances, respectively, until each of the Class A-1B1-L, Class A-1B2-L and Class A-1B3-L Principal Balance has been reduced to zero and all interest losses that would otherwise be allocated to the Class A-1A-L Regular Interest pursuant to clause (ii) of this paragraph shall instead (1) first be allocated to the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Regular Interests, pro rata, in reduction of accrued but unpaid interest thereon, and then in reduction of the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Principal Balances, respectively, until each of the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Principal Balance has been reduced to zero and (2) second, be allocated to the Class A-1B1-L, Class A-1B2-L and Class A-1B3-L Regular Interests, pro rata, in reduction of accrued but unpaid interest thereon, and then in reduction of the Class A-1B1-L, Class A-1B2-L and Class A-1B3-L Principal Balances, respectively, until each of the Class A-1B1-L, Class A-1B2-L and Class A-1B3-L Principal Balance has been reduced to zero; *provided, further*, all principal losses that would otherwise be allocated to the Class A-1B1-L, Class A-1B2-L or Class A-1B3-L Regular Interests pursuant to clause (i) of this paragraph shall instead be allocated to the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Regular Interests, pro rata, in reduction of the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Principal Balances, respectively, until each of the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L or Class A-1C4-L Principal Balance has been reduced to zero and all interest losses that would otherwise be allocated to the Class A-1B1-L, Class A-1B2-L or Class A-1B3-L Regular Interest pursuant to clause (ii) of this paragraph shall instead be allocated to the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Regular Interests, pro rata, in reduction of accrued but unpaid interest thereon, and then in reduction of the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Principal Balances, respectively, until each of the Class A-1C1-L, Class A-1C2-L, Class A-1C3-L and Class A-1C4-L Principal Balance has been reduced to zero.

On each Distribution Date, after giving effect to the principal distributions and allocations of losses and Net Negative Amortization Amounts as provided in this Agreement (without regard to this paragraph), if the aggregate Class Principal Balance of all outstanding Classes of REMIC II Regular Interests and the Class R-1 Residual Interest (plus any Cumulative Carry-Forward Subsequent Recoveries Amount for such Distribution Date) exceeds the aggregate principal balance of the Mortgage Loans remaining to be paid at the close of business on the Cut-Off Date, after deduction of (i) all principal payments due on or before the Cut-Off Date in respect of each Mortgage Loan whether or not paid, and (ii) all amounts of principal in respect of each Mortgage Loan that have been received or advanced and included in the REMIC II Available Distribution Amount and all losses in respect of each Mortgage Loan that have been allocated to the REMIC II Regular Interests on such Distribution Date or prior Distribution Dates, and after giving effect to all Negative Amortization Amounts in respect of each Mortgage Loan that have been added to the principal balance of such Mortgage Loan prior to such Distribution Date, then such excess will be deemed a principal loss and will be allocated to the most junior Class of Class B-L Regular Interests, in reduction of the Class Principal Balance thereof.

*Recognition Agreement*:  With respect to a Cooperative Loan, the recognition agreement between the Cooperative and the originator of such Cooperative Loan.

*Record Date*:  The last Business Day of the month immediately preceding the month of the related Distribution Date.

*Reference Banks*: As defined in Section 3.19(b).

*Regular Interests*:  (i) With respect to REMIC I, the REMIC I Regular Interests and (ii) with respect to REMIC II, the REMIC II Regular Interests.

*Relief Act Shortfall*:  For any Distribution Date for any Mortgage Loan with respect to which the Servicemembers Civil Relief Act, formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940, or any comparable state legislation (collectively, the "Relief Act"), limits the amount of interest payable by the related Mortgagor, an amount equal to one month's interest on such Mortgage Loan at an annual interest rate equal to the excess, if any, of (i) the annual interest rate otherwise payable by the Mortgagor on the related Due Date under the terms of the related Mortgage Note over (ii) the annual interest rate payable by the Mortgagor on the related Due Date by application of the Relief Act.

*REMIC*:  A real estate mortgage investment conduit, as such term is defined in the Code.

*REMIC Provisions*:  Sections 860A through 860G of the Code, related Code provisions and regulations promulgated thereunder, as the foregoing may be in effect from time to time.

*REMIC I*:  The segregated pool of assets of the Trust consisting of the REMIC I Assets, which shall be a REMIC pursuant to the Code, with respect to which a separate REMIC election is to be made and the beneficial interests in which shall be the REMIC I Regular Interests and the Class R-1 Residual Interest.

*REMIC I Assets*:  All of the Mortgage Pool Assets other than (i) the Yield Maintenance Agreement and any proceeds thereof and (ii) the Assigned Prepayment Premiums.

*REMIC I Available Distribution Amount*:  For any Distribution Date, the sum of the following amounts with respect to the Mortgage Loans:

(1)      the total amount of all cash received by or on behalf of the Servicer with respect to such Mortgage Loans by the Determination Date for such Distribution Date and not previously distributed, including Monthly P&I Advances made the Servicer, Liquidation Proceeds and scheduled amounts of distributions from Buydown Funds respecting Buydown Loans, if any, except:

(a)      all scheduled payments of principal and interest collected but due subsequent to such Distribution Date;

(b)      all Curtailments received after the Prior Period;

(c)      all Payoffs received after the Payoff Period immediately preceding such Distribution Date (together with any interest payment received with such Payoffs to the extent that it represents the payment of interest accrued on the Mortgage Loans for the period subsequent to the Prior Period), and interest which was accrued and received on Payoffs received during the period from the 1st to the 14th day of the month of such Distribution Date, which interest shall not be included in the calculation of the REMIC I Available Distribution Amount for any Distribution Date;

(d)    Insurance Proceeds, Liquidation Proceeds and Subsequent Recoveries received on such Mortgage Loans after the Prior Period;

(e)    all amounts in the Certificate Account which are due and reimbursable to the Servicer pursuant to the terms of this Agreement;

(f)    the Servicing Fee for each such Mortgage Loan, and any Special Primary Insurance Premium payable on such Distribution Date with respect to such Mortgage Loan; and

(g)    Excess Liquidation Proceeds;

(2)    the sum, to the extent not previously distributed, of the following amounts, to the extent advanced or received, as applicable, by the Servicer:

(a)    any Monthly P&I Advance made by the Servicer to the Trustee with respect to such Distribution Date relating to such Mortgage Loans; and

(b)    Compensating Interest; and

(3)    the total amount of any cash received during the Prior Period by the Trustee or the Servicer in respect of a Purchase Obligation under Section 2.07 and Section 2.08 or any permitted purchase of such a Mortgage Loan.

*REMIC I Distribution Amount*:  For any Distribution Date, the REMIC I Available Distribution Amount for such Distribution Date shall be distributed to the REMIC I Regular Interests and the Class R-1 Residual Interest in the following amounts and priority, to the extent of the REMIC I Available Distribution Amount for such Distribution Date:

(i)    first, to the Class LT1, Class LT2 and Class LT4 Regular Interests and the Class R-1 Residual Interest, concurrently, the sum of the Interest Distribution Amounts for such Classes remaining unpaid from previous Distribution Dates, pro rata according to their respective shares of such unpaid amounts;

(ii)    second, to the Class LT1, Class LT2 and Class LT4 Regular Interests and the Class R-1 Residual Interest, concurrently, the sum of the Interest Distribution Amounts for such Classes for the current Distribution Date, pro rata according to their respective Interest Distribution Amounts;

(iii)    third, to the Class R-1 Residual Interest, until the Class Principal Balance thereof has been reduced to zero;

(iv)    fourth, to the REMIC I Regular Interests, as principal, the REMIC I Principal Distribution Amount, sequentially as follows:

(a)    first, to the Class LT2, Class LT3 and Class LT4 Regular Interests, the Class LT2 Principal Distribution Amount, the Class LT3 Principal Distribution Amount and the Class LT4 Principal Distribution Amount, respectively;

(b)    second, to the Class LT1 Regular Interest, until its Class Principal Balance has been reduced to zero; and

(c)    third, to the Class LT2, Class LT3 and Class LT4 Regular Interests, pro rata according to Class Principal Balance, until their respective Class Principal Balances have been reduced to zero;

(v)    fifth, to each Class of REMIC I Regular Interests, pro rata according to the amount of unreimbursed Realized Losses allocable to principal previously allocated to each such Class, the aggregate amount of any distributions to the REMIC II Regular Interests pursuant to paragraph (I)(xxxxiii) of the definition of *"REMIC II Distribution Amount"* on such Distribution Date; *provided, however,* that any amounts distributed pursuant to this paragraph (v) of this definition of *"REMIC I Distribution Amount"* shall not cause a further reduction in the Class Principal Balances of any of the REMIC I Regular Interests; and

(vi)    sixth, to the Class R-1 Residual Interest, the Residual Distribution Amount for the Class R-1 Residual Interest for such Distribution Date.

*REMIC I Principal Distribution Amount*:  For any Distribution Date, an amount equal to the sum of (a) the Principal Payment Amount for such Distribution Date, (b) the Principal Prepayment Amount for such Distribution Date, (c) the aggregate of Liquidation Principal for all Mortgage Loans which became Liquidated Mortgage Loans during the Prior Period and (d) any Subsequent Recoveries for such Distribution Date.

*REMIC I Regular Interests*:  The Classes of undivided beneficial interests in REMIC I designated as *"regular interests"* in the table titled *"REMIC I Interests"* in the Preliminary Statement hereto.  The REMIC I Regular Interests, together with the Class R-1 Residual Interest, shall be deemed to be a separate series of beneficial interests in the assets of the Trust consisting of the REMIC I Assets pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

*REMIC II*:  The segregated pool of assets of the Trust consisting of the REMIC II Assets, which shall be a REMIC pursuant to the Code, with respect to which a separate REMIC election is to be made, and the beneficial interests in which shall be the REMIC II Regular Interests and the Class R-2 Residual Interest.

*REMIC II Assets*:  The REMIC I Regular Interests.

*REMIC II Available Distribution Amount*:  For any Distribution Date, the aggregate of all distributions to the REMIC I Regular Interests (which amount shall be available for distributions to the REMIC II Regular Interests and the Class R-2 Residual Interest as provided herein).

*REMIC II Distribution Amount*:  (I) For any Distribution Date prior to the Credit Support Depletion Date, the REMIC II Available Distribution Amount for such Distribution Date shall be distributed to the REMIC II Regular Interests and the Class R-2 Residual Interest in the following amounts and priority, to the extent of the REMIC II Available Distribution Amount for such Distribution Date:

(i)    first, to the Class A-L and Class X-L Regular Interests and the Class R-1 Residual Interest, concurrently, the sum of the Interest Distribution Amounts for such Classes remaining unpaid from previous Distribution Dates, pro rata according to their respective shares of such unpaid amounts;

(ii)    second, to the Class A-L and Class X-L Regular Interests and the Class R-1 Residual Interest, concurrently, the sum of the Interest Distribution Amounts for such Classes for the current Distribution Date, pro rata according to their respective Interest Distribution Amounts;

(iii)    third, to the Class A-L Regular Interests and the Class X PO Component of the Class X-L Regular Interests, as principal, the Senior Principal Distribution Amount (reduced by $100 for the first Distribution Date), sequentially, as follows:

    (a)    first, to the Class A-L Regular Interests concurrently, pro rata according to the Class Principal Balance (or with respect to clauses (2) and (4) of this paragraph, the respective aggregate Class Principal Balance) of the Regular Interests described in each of clause (1), (2), (3), (4) and (5), as follows:

    (1) to the Class A-1A-L Regular Interest, until the Class A-1A-L Principal Balance has been reduced to zero;

    (2) to the Class A-1B1-L and Class A-1B2-L Regular Interests, sequentially, as follows:

        (A)    first, to the Class A-1B1-L Regular Interest, until the Class A-1B1-L Principal Balance has been reduced to zero; and

        (B)    second, to the Class A-1B2-L Regular Interest, until the Class A-1B2-L Principal Balance has been reduced to zero; and

    (3) to the Class A-1B3-L Regular Interest, until the Class A-1B3-L Principal Balance has been reduced to zero;

    (4) to the Class A-1C1-L, Class A-1C2-L and Class A-1C3-L Regular Interest, sequentially, as follows:

        (A)    first, to the Class A-1C1-L Regular Interest, until the Class A-1C1-L Principal Balance has been reduced to zero;

        (B)    second, to the Class A-1C2-L Regular Interest, until the Class A-1C2-L Principal Balance has been reduced to zero; and

        (C)    third, to the Class A-1C3-L Regular Interest, until the Class A-1C3-L Principal Balance has been reduced to zero; and;

    (5) to the Class A-1C4-L Regular Interest, until the Class A-1C4-L Principal Balance has been reduced to zero; and

    (b)    second, to the Class X-L Regular Interest, until the Class X-L Principal Balance has been reduced to zero;

    (iv)    fourth, to the Class B-1-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

  (v)    fifth, to the Class B-1-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

  (vi)    sixth, to the Class B-1-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-1-L Principal Balance has been reduced to zero;

  (vii)    seventh, to the Class B-2-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

  (viii)    eighth, to the Class B-2-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

  (ix)    ninth, to the Class B-2-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-2-L Principal Balance has been reduced to zero;

  (x)    tenth, to the Class B-3-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

  (xi)    eleventh, to the Class B-3-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

  (xii)    twelfth, to the Class B-3-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-3-L Principal Balance has been reduced to zero;

  (xiii)    thirteenth, to the Class B-4-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

  (xiv)    fourteenth, to the Class B-4-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

  (xv)    fifteenth, to the Class B-4-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-4-L Principal Balance has been reduced to zero;

  (xvi)    sixteenth, to the Class B-5-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

  (xvii)    seventeenth, to the Class B-5-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

  (xviii)    eighteenth, to the Class B-5-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-5-L Principal Balance has been reduced to zero;

  (xix)    nineteenth, to the Class B-6-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

  (xx)    twentieth, to the Class B-6-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

  (xxi)    twenty-first, to the Class B-6-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-6-L Principal Balance has been reduced to zero;

  (xxii)    twenty-second, to the Class B-7-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

  (xxiii)    twenty-third, to the Class B-7-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

  (xxiv)    twenty-four, to the Class B-7-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-7-L Principal Balance has been reduced to zero;

(xxv)    twenty-fifth, to the Class B-8-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

(xxvi)    twenty-sixth, to the Class B-8-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

(xxvii)    twenty-seventh, to the Class B-8-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-8-L Principal Balance has been reduced to zero;

(xxviii)    twenty-eighth, to the Class B-9-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

(xxix)    twenty-ninth, to the Class B-9-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

(xxx)    thirtieth, to the Class B-9-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-9-L Principal Balance has been reduced to zero;

(xxxi)    thirty-first, to the Class B-10-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

(xxxii)    thirty-second, to the Class B-10-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

(xxxiii)    thirty-third, to the Class B-10-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-10-L Principal Balance has been reduced to zero;

(xxxiv)    thirty-fourth, to the Class B-11-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

(xxxv)    thirty-fifth, to the Class B-11-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

(xxxvi)    thirty-sixth, to the Class B-11-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-11-L Principal Balance has been reduced to zero;

(xxxvii)    thirty-seventh, to the Class B-12-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

(xxxviii)    thirty-eighth, to the Class B-12-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

(xxxix)    thirty-ninth, to the Class B-12-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-12-L Principal Balance has been reduced to zero;

(xxxx)    fortieth, to the Class B-13-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests remaining unpaid from previous Distribution Dates;

(xxxxi)    forty-first, to the Class B-13-L Regular Interest, the Interest Distribution Amount for such Class of Regular Interests for the current Distribution Date;

(xxxxii)    forty-second, to the Class B-13-L Regular Interest, the portion of the Subordinate Principal Distribution Amount allocable to such Class of Regular Interests pursuant to the definition of *"Subordinate Principal Distribution Amount,"* until the Class B-13-L Principal Balance has been reduced to zero;

(xxxxiii)    forty-third, to the outstanding Classes of REMIC II Regular Interests in the order of seniority (which, from highest to lowest, shall be as follows: the Class A-L and Class X-L Regular Interests of equal seniority, and then Class B-1-L, Class B-2-L, Class B-3-L, Class B-4-L, Class B-5-L, Class B-6-L, Class B-7-L, Class B-8-L, Class B-9-L, Class B-10-L, Class B-11-L, Class B-12-L and Class B-13-L Regular Interests of decreasing seniority) the remaining portion, if any, of the REMIC II Available Distribution Amount, up to the amount of unreimbursed Realized Losses allocable to principal previously allocated or to be allocated on such Distribution Date to such Class, if any; *provided, however,* that in the case of Classes of equal seniority, the amount distributable to such Classes shall be allocated among such Classes according to the amount of losses allocated thereto; *provided, further,* that any amounts distributed pursuant to this paragraph (I)(xxxxiii) of this definition of *"REMIC II Distribution Amount"* shall not cause a reduction in the Class Principal Balances of any of the Classes of REMIC II Regular Interests; and

(xxxxiv)    forty-fourth, to the Class R-1 Residual Interest, the Residual Distribution Amount for the Class R-1 Residual Interest for such Distribution Date.

(II)    For any Distribution Date on or after the Credit Support Depletion Date, the REMIC II Available Distribution Amount for such Distribution Date shall be distributed to the outstanding Classes of REMIC II Regular Interests and the Class R-2 Residual Interest in the following amounts and priority, to the extent of the REMIC II Available Distribution Amount for such Distribution Date:

(i)    first, to the Class A-L and Class X-L Regular Interests, the amount payable to each such Class of Regular Interests on prior Distribution Dates pursuant to clause (I)(ii) or (II)(ii) of this definition of *"REMIC II Distribution Amount,"* and remaining unpaid, pro rata according to such amount payable to the extent of amounts available;

(ii)    second, to the Class A-L and Class X-L Regular Interests, concurrently, the sum of the Interest Distribution Amounts for such Classes of Regular Interests for the current Distribution Date, pro rata according to their respective Interest Distribution Amounts;

(iii)    third, to the Class A-L Regular Interests and the Class X PO Component of the Class X-L Regular Interests, pro rata according to Class Principal Balance, as principal, the Senior Principal Distribution Amount;

(iv)    fourth, to the Class R-2 Residual Interest, the Residual Distribution Amount for the Class R-2 Residual Interest for such Distribution Date.

*REMIC II Regular Interests*:  The Classes of undivided beneficial interests in REMIC II designated as *"regular interests"* in the table titled *"REMIC II Interests"* in the Preliminary Statement hereto.  The REMIC II Regular Interests, together with the Class R-2 Residual Interest, shall be deemed to be a separate series of beneficial interests in the assets of the Trust consisting of the REMIC II Assets pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

*Residual Certificates*:  The Class R Certificates.

*Residual Distribution Amount*:  For any Distribution Date, with respect to the Class R-1 Residual Interest, any portion of the REMIC I Available Distribution Amount remaining after all distributions of the REMIC I Available Distribution Amount pursuant to the definition of *"REMIC I Distribution Amount"* (other than the distributions pursuant to the last clause thereof).

For any Distribution Date, with respect to the Class R-2 Residual Interest, any portion of the REMIC II Available Distribution Amount remaining after all distributions of the REMIC II Available Distribution Amount pursuant to the definition of *"REMIC II Distribution Amount"* (other than the distributions pursuant to the last clause thereof).

Upon termination of the obligations created by this Agreement and liquidation of REMIC I and REMIC II, the amounts which remain on deposit in the Certificate Account after payment to the Holders of the REMIC I Regular Interests of the amounts set forth in Section 9.01 of this Agreement, and subject to the conditions set forth therein, shall be distributed to the Class R-1 and Class R-2 Residual Interests in accordance with the preceding sentences of this definition as if the date of such distribution were a Distribution Date.

*Responsible Officer*:  When used with respect to the Trustee or the Delaware Trustee, any officer assigned to and working in the Corporate Trust Office (in the case of the Trustee) or its corporate trust office (in the case of the Delaware Trustee) or, in each case, in a similar group and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

*ROV Mortgage Loan*:  A Mortgage Loan originated by Washington Mutual Bank or an affiliate thereof with respect to which the value set forth on the appraisal has been appealed and, as a result, an internal valuation has been conducted and included in a residential appraisal review contained in the related credit file.

*S&P*:  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., provided that at any time it be a Rating Agency.

*Secretary of State*:  The Secretary of State of the State of Delaware.

*Securities Act*:  The Securities Act of 1933, as amended.

*Security Agreement*:  With respect to a Cooperative Loan, the agreement or mortgage creating a security interest in favor of the originator of the Cooperative Loan in the related Cooperative Stock.

*Senior Certificates*:  The Class A, Class X and Class R Certificates.

*Senior Liquidation Amount*:  For any Distribution Date, the sum of (A) the aggregate, for each Mortgage Loan which became a Liquidated Mortgage Loan during the Prior Period, of the lesser of: (i) the Senior Percentage of the Principal Balance of such Mortgage Loan and (ii) the Senior Prepayment Percentage of the Liquidation Principal with respect to such Mortgage Loan and (B) the Senior Prepayment Percentage of any Subsequent Recoveries for such Distribution Date.

*Senior Percentage*:  For any Distribution Date, the aggregate Class Principal Balance of the Class A Certificates, the Class X PO Component of the Class X Certificates and the Residual Certificates divided by the aggregate Class Principal Balance of the Class A Certificates, the Class X PO Component of the Class X Certificates, the Class B Certificates and the Residual Certificates, in each case immediately before such Distribution Date.

*Senior Prepayment Percentage*: Subject to the immediately succeeding paragraph, (A) for any Distribution Date prior to the tenth anniversary of the first Distribution Date, the Senior Prepayment Percentage shall equal 100% and (B) for any Distribution Date on or after the tenth anniversary of the first Distribution Date, the Senior Prepayment Percentage shall be calculated as follows: (1) for any such Distribution Date on or after the tenth anniversary but before the eleventh anniversary of the first Distribution Date, the Senior Percentage for such Distribution Date plus 70% of the Subordinate Percentage for such Distribution Date; (2) for any such Distribution Date on or after the eleventh anniversary but before the twelfth anniversary of the first Distribution Date, the Senior Percentage for such Distribution Date plus 60% of the Subordinate Percentage for such Distribution Date; (3) for any such Distribution Date on or after the twelfth anniversary but before the thirteenth anniversary of the first Distribution Date, the Senior Percentage for such Distribution Date plus 40% of the Subordinate Percentage for such Distribution Date; (4) for any such Distribution Date on or after the thirteenth anniversary but before the fourteenth anniversary of the first Distribution Date, the Senior Percentage for such Distribution Date plus 20% of the Subordinate Percentage for such Distribution Date; and (5) for any such Distribution Date thereafter, the Senior Percentage for such Distribution Date; *provided, however*, that (x) for any Distribution Date on or prior to the Distribution Date in August 2008, if (i) the Subordinate Percentage for such Distribution Date is greater than or equal to twice the Subordinate Percentage as of the Closing Date and (ii) cumulative Realized Losses on the Mortgage Loans allocated to the Class B Certificates, as a percentage of the aggregate Class Principal Balance of the Class B Certificates as of the Closing Date, do not exceed 20%, then the Senior Prepayment Percentage shall equal the Senior Percentage for such Distribution Date plus 50% of the Subordinate Percentage for such Distribution Date and (y) for any Distribution Date after the Distribution Date in August 2008, if (i) the Subordinate Percentage for such Distribution Date is greater than or equal to twice the Subordinate Percentage as of the Closing Date and (ii) cumulative Realized Losses on the Mortgage Loans allocated to the Class B Certificates, as a percentage of the aggregate Class Principal Balance of the Class B Certificates as of the Closing Date, do not exceed 30%, then the Senior Prepayment Percentage shall equal the Senior Percentage for such Distribution Date.

Notwithstanding the immediately preceding paragraph, (A) for any Distribution Date, if the Senior Percentage for such Distribution Date is greater than the Senior Percentage as of the Closing Date, then the Senior Prepayment Percentage shall equal 100%, (B) for any Distribution Date on or before the tenth anniversary of the first Distribution Date, if any of the tests specified in clauses (a) and (b) below is met, then the Senior Prepayment Percentage shall equal 100% and (C) for any Distribution Date after the tenth anniversary of the first Distribution Date, if any of the tests specified in clauses (a) and (b) below is met (unless either (x) the Senior Percentage for such Distribution Date is greater than the Senior Percentage as of the Closing Date or (y) there is no Earlier Distribution Date (as defined below), in each of which case the Senior Prepayment Percentage shall equal 100%), then the Senior Prepayment Percentage shall be calculated as follows: (1) if the most recent preceding Distribution Date on which none of the tests specified in clauses (a) and (b) below was met (such date referred to as the "Earlier Distribution Date") is on or after the tenth anniversary but before the eleventh anniversary of the first Distribution Date, then the Senior Prepayment Percentage shall equal the Senior Percentage for the current Distribution Date plus 70% of the Subordinate Percentage for the current Distribution Date, (2) if the Earlier Distribution Date is on or after the eleventh anniversary but before the twelfth anniversary of the first Distribution Date, then the Senior Prepayment Percentage shall equal the Senior Percentage for the current Distribution Date plus 60% of the Subordinate Percentage for the current Distribution Date, (3) if the Earlier Distribution Date is on or after the twelfth anniversary but before the thirteenth anniversary of the first Distribution Date, then the Senior Prepayment Percentage shall equal the Senior Percentage for the current Distribution Date plus 40% of the Subordinate Percentage for the current Distribution Date, (4) if the Earlier Distribution Date is on or after the thirteenth anniversary but before the fourteenth anniversary of the first Distribution Date, then the Senior Prepayment Percentage shall equal the Senior Percentage for the current Distribution Date plus 20% of the Subordinate Percentage for the current Distribution Date, and (5) if the Earlier Distribution Date is on or after the fourteenth anniversary of the first Distribution Date, then the Senior Prepayment Percentage shall equal the Senior Percentage for the current Distribution Date:

    (a)    the mean aggregate Principal Balance, as of the Distribution Date in each of the immediately preceding six calendar months, of the Mortgage Loans which were 60 or more days delinquent as of such date (including Mortgage Loans in bankruptcy or foreclosure and Mortgaged Properties held by REMIC I) is greater than 50% of the aggregate Class Principal Balance of the Class B Certificates as of the current Distribution Date, or

    (b)    cumulative Realized Losses on the Mortgage Loans allocated to the Class B Certificates, as a percentage of the aggregate Class Principal Balance of the Class B Certificates as of the Closing Date, are greater than, for any Distribution Date (1) before the eleventh anniversary of the first Distribution Date, 30%, (2) on or after the eleventh

anniversary but before the twelfth anniversary of the first Distribution Date, 35%, (3) on or after the twelfth anniversary but before the thirteenth anniversary of the first Distribution Date, 40%, (4) on or after the thirteenth anniversary but before the fourteenth anniversary of the first Distribution Date, 45%, and (5) on or after the fourteenth anniversary of the first Distribution Date, 50%.

If on any Distribution Date the allocation to the Class A and Class X Certificates of Principal Prepayments in the percentage required would reduce the aggregate Class Principal Balance of such Certificates below zero, the Senior Prepayment Percentage for such Distribution Date shall be limited to the percentage necessary to reduce such aggregate Class Principal Balance to zero.

*Senior Principal Distribution Amount*: For any Distribution Date, an amount equal to the sum of (a) the Senior Percentage of the Principal Payment Amount, (b) the Senior Prepayment Percentage of the Principal Prepayment Amount and (c) the Senior Liquidation Amount.

*Senior Subordinate Certificates*: The Subordinate Certificates other than the Junior Subordinate Certificates.

*Servicer*: Washington Mutual Bank, or any successor thereto appointed as provided pursuant to Section 7.02, acting to service and administer the Mortgage Loans pursuant to Section 3.01.

*Servicer Business Day*: Any day other than a Saturday, a Sunday, or a day on which banking institutions in Seattle, Washington or in any other city in which a corporate office of the Servicer is located are authorized or obligated by law or executive order to be closed.

*Servicing Fee*: For each Mortgage Loan, the fee charged by the Servicer for servicing and advancing certain expenses with respect to such Mortgage Loan, equal to 1/12 of the product of (i) the Servicing Fee Rate for such Mortgage Loan and (ii) the outstanding Principal Balance of such Mortgage Loan, payable monthly from the Certificate Account, the Investment Account or the Custodial Account for P&I. In addition, any prepayment penalty received on a Mortgage Loan that is not an Assigned Prepayment Premium will be paid as additional servicing compensation to the Servicer.

*Servicing Fee Rate*: For each Mortgage Loan, the per annum rate payable to the Servicer, as set forth for such Mortgage Loan in the Mortgage Loan Schedule, equal to 0.375%.

*Servicing Officer*: Any officer of the Servicer (or of the Servicer, but only with respect to the Custodial Agreement) involved in, or responsible for, the administration and servicing of the Mortgage Loans or the Certificates, as applicable, whose name and specimen signature appear on a list of servicing officers furnished to the Trustee by the Servicer, as such list may from time to time be amended.

*Special Primary Insurance Policy*: Any Primary Insurance Policy covering a Mortgage Loan the premium of which is payable by the Trustee pursuant to Section 4.04(a), if so identified in the Mortgage Loan Schedule. There are no Special Primary Insurance Policies with respect to any of the Mortgage Loans.

*Special Primary Insurance Premium*: With respect to any Special Primary Insurance Policy, the monthly premium payable thereunder.

*Statutory Trust Statute*: Chapter 38 of Title 12 of the Delaware Code, 12 Del.C. §3801 et seq., as the same may be amended from time to time.

*Streamlined Mortgage Loan*: A Mortgage Loan originated in connection with the refinance of a mortgage loan pursuant to the streamlined loan documentation program then in effect of the seller from which the Company acquired the Mortgage Loan.

*Subordinate Certificates*: The Class B Certificates.

*Subordinate Liquidation Amount*: For any Distribution Date, the excess, if any, of the sum of (A) the aggregate of Liquidation Principal for all Mortgage Loans which became Liquidated Mortgage Loans during the Prior Period and (B) any Subsequent Recoveries for such Distribution Date, over the Senior Liquidation Amount for such Distribution Date.

*Subordinate Percentage*: For any Distribution Date, the excess of 100% over the Senior Percentage for such date.

*Subordinate Prepayment Percentage*: For any Distribution Date, the excess of 100% over the Senior Prepayment Percentage for such Distribution Date; *provided, however,* that if the aggregate Class Principal Balance of the Class A Certificates, the Class X PO Component of the Class X Certificates and the Residual Certificates has been reduced to zero, then the Subordinate Prepayment Percentage shall equal 100%.

*Subordinate Principal Distribution Amount*: For any Distribution Date, the sum of (i) the Subordinate Percentage of the Principal Payment Amount, (ii) the Subordinate Principal Prepayments Distribution Amount and (iii) the Subordinate Liquidation Amount.

For any Distribution Date, the Subordinate Principal Distribution Amount shall be allocated pro rata, by Class Principal Balance, among the Classes of Class B-L Regular Interests and paid in the order of distribution to such Classes pursuant to the definition of *"REMIC II Distribution Amount"* except as otherwise stated in such definition. Notwithstanding the foregoing, for any Distribution Date prior to distributions on such date, if the Subordination Level for any Class or Classes of Class B-L Regular Interests is less than such Subordination Level as of the Closing Date, then the pro rata portion of the Subordinate Principal Prepayments Distribution Amount, if any, otherwise allocable to such Class or Classes of Class B-L Regular Interests shall be allocated to the more senior Classes of Class B-L Regular Interests, pro rata according to the Class Principal Balances of such Classes. For purposes of this definition and the definition of *"Subordination Level,"* the relative seniority, from highest to lowest, of the Class B-L Regular Interests shall be as follows: Class B-1-L, Class B-2-L, Class B-3-L, Class B-4-L, Class B-5-L, Class B-6-L, Class B-7-L, Class B-8-L, Class B-9-L, Class B-10-L, Class B-11-L, Class B-12-L and Class B-13-L.

*Subordinate Principal Prepayments Distribution Amount*: For any Distribution Date, the Subordinate Prepayment Percentage of the Principal Prepayment Amount.

*Subordination Level*: On any specified date, with respect to any Class of Class B-L Regular Interests, the percentage obtained by dividing the aggregate Class Principal Balance of such Class and the Classes of Class B-L Regular Interests which are subordinate in right of payment to such Class by the aggregate Class Principal Balance of the REMIC II Regular Interests and the Class R-1 Residual Interest as of such date prior to giving effect to distributions of principal and interest, allocations of Realized Losses and allocations of Net Negative Amortization Amounts on such date.

*Subsequent Recoveries*: For any Distribution Date, amounts received by the Servicer during the Prior Period (after deduction of amounts reimbursable under Section 3.05(a)(i) and (ii)) in connection with the liquidation of defaulted Mortgage Loans after such Mortgage Loans became Liquidated Mortgage Loans, for each such Mortgage Loan up to the amount of Realized Losses, if any, previously allocated in respect of such Mortgage Loan in reduction of the Class Principal Balance of any Class of Certificates.

*Substitute Mortgage Loan*: A Mortgage Loan which is substituted for another Mortgage Loan pursuant to and in accordance with the provisions of Section 2.07.

*Tax Matters Person*: With respect to each of REMIC I and REMIC II, a Holder of a Class R Certificate with a Percentage Interest of at least 0.01% or any Permitted Transferee of such Class

R Certificateholder designated as succeeding to the position of Tax Matters Person in a notice to the Trustee signed by authorized representatives of the transferor and transferee of such Class R Certificate. The Servicer is hereby appointed to act as the Tax Matters Person for REMIC I and REMIC II so long as it holds a Class R Certificate with a Percentage Interest of at least 0.01%. In the event that the Servicer ceases to hold a Class R Certificate with the required Percentage Interest, the holder of the Class R Certificate with the largest Percentage Interest shall be Tax Matters Person, and such Tax Matters Person shall be deemed to have appointed the Servicer to act as agent for the Tax Matters Person for REMIC I and REMIC II, to perform the functions of such Tax Matters Person as provided herein. If the Tax Matters Person for REMIC I and REMIC II becomes a Disqualified Organization, the last preceding Holder, that is not a Disqualified Organization, of the Class R Certificate held by the Disqualified Organization shall be Tax Matters Person pursuant to and as permitted by Section 5.01(c). If any Person is appointed as tax matters person by the Internal Revenue Service pursuant to the Code, such Person shall be Tax Matters Person.

*Termination Date*:  The date upon which final payment of the Certificates will be made pursuant to the procedures set forth in Section 9.01(b).

*Termination Payment*:  The final payment delivered to the Certificateholders on the Termination Date pursuant to the procedures set forth in Section 9.01(b).

*Transfer*:  Any direct or indirect transfer or sale of any Ownership Interest in a Residual Certificate.

*Transferee*:  Any Person who is acquiring by Transfer any Ownership Interest in a Residual Certificate.

*Transferee Affidavit and Agreement*:  An affidavit and agreement in the form attached hereto as Exhibit J.

*Trust*:  WaMu Mortgage Pass-Through Certificates Series 2005-AR11 Trust, a Delaware statutory trust, created pursuant to this Agreement.

*Trustee*:  Deutsche Bank National Trust Company, or its successor-in-interest as provided in Section 8.09, or any successor trustee appointed as herein provided.

*Uncollected Interest*:  With respect to any Distribution Date for any Mortgage Loan on which a Payoff was made by a Mortgagor during the related Payoff Period, except for Payoffs received during the period from the first through the 14th day of the month of such Distribution Date, an amount equal to one month's interest at the applicable Pass-Through Rate on such Mortgage Loan less the amount of interest actually paid by the Mortgagor with respect to such Payoff.

*Uncompensated Interest Shortfall*:  For any Distribution Date, the sum of (i) the aggregate Relief Act Shortfall for such Distribution Date, (ii) aggregate Curtailment Shortfall for such Distribution Date and (iii) the excess, if any, of (a) aggregate Uncollected Interest for such Distribution Date over (b) Compensating Interest for such Distribution Date.

Uncompensated Interest Shortfall shall be allocated to the REMIC I Regular Interests pro rata according to the amount of interest accrued on each such Class during the immediately preceding accrual period, in reduction thereof.

Uncompensated Interest Shortfall shall be allocated to the REMIC II Regular Interests pro rata according to the amount of interest accrued on each such Class during the related immediately preceding accrual period, in reduction thereof.

*Underwriters*:  WaMu Capital Corp. and Greenwich Capital Markets, Inc.

*Underwriting Standards*:  The underwriting standards of the Company or Washington Mutual Bank, as applicable.

*Uninsured Cause*:  Any cause of damage to a Mortgaged Property, the cost of the complete restoration of which is not fully reimbursable under the hazard insurance policies required to be maintained pursuant to Section 3.07.

*U.S. Person*:  A citizen or resident of the United States of America, a corporation, partnership or other entity created or organized in or under the laws of the United States of America, any state thereof or the District of Columbia, or an estate or trust that is subject to U.S. federal income tax regardless of the source of its income.

*VA*:  The Department of Veterans Affairs, formerly known as the Veterans Administration, or any successor thereto.

*Weighted Average Pass-Through Rate*:  For any Distribution Date, the weighted average of the Pass-Through Rates on the Mortgage Loans as of the second preceding Due Date (after giving effect to the payments due on the Mortgage Loans on that Due Date).

*Withdrawal Date*:  Any day during the period commencing on the 18th day of the month of the related Distribution Date (or if such day is not a Business Day, the immediately preceding Business Day) and ending on the last Business Day prior to the 21st day of the month of such Distribution Date. The *"related Due Date"* for any Withdrawal Date is the Due Date immediately preceding the related Distribution Date.

*Yield Maintenance Account*:  The separate trust account maintained and held by the Trustee pursuant to Section 3.16, which account shall bear a designation clearly indicating that the funds deposited therein are held in trust for the benefit of the Trust on behalf of the Class A Certificateholders, and which account provides that the Trustee may make, or cause to be made, withdrawals therefrom in accordance with Section 3.16.

*Yield Maintenance Agreement*:  The transactions evidenced by the novation agreement, together with the related confirmations, each dated as of August 25, 2005, and any other related documents thereto, between the Cap Counterparty and the Trustee, which shall be an asset of the Trust.

*Yield Maintenance Available Payment Amount*:  For any Distribution Date from and including October 2005 to and including the Final Yield Maintenance Payment Date, the lesser of (a) the amounts received by the Trustee pursuant to the Yield Maintenance Agreement for such Distribution Date and deposited by the Trustee into the Yield Maintenance Account in accordance with Section 3.16 hereto and (b) a ratio, the numerator of which is the actual number of days in the accrual period and the denominator of which is 360 of the product of (i) the excess, if any, of (x) LIBOR, subject to a maximum of 10.17%, over (y) the related Cap Strike Rate and (ii) the lesser of (a) the aggregate Class Principal Balance of the Class A Certificates immediately prior to such Distribution Date and (b) the related Yield Maintenance Notional Balance for such Distribution Date.

*Yield Maintenance Notional Balance*:  For any Distribution Date from and including October 2005 to and including the Final Yield Maintenance Payment Date, shall mean the corresponding amount listed for such Distribution Date in Schedule 1 of the Prospectus for the Yield Maintenance Agreement. After the Final Yield Maintenance Payment Date, the Yield Maintenance Notional Balance will be equal to zero and the Yield Maintenance Agreement will be terminated.

*Yield Maintenance Payment*:  For any Class of Class A Certificates and for any Distribution Date from and including October 2005 to and including the Final Yield Maintenance Payment Date, the lesser of (a) the Carryover Shortfall Amount for such Class for such Distribution Date and (b) such Class' pro rata share of the Yield Maintenance Available Payment Amount for such Distribution Date (such pro rata share calculated based on an allocation of such Yield Maintenance Available Payment Amount among the Class A Certificates pro rata according to Carryover Shortfall Amount).

## ARTICLE II

Creation of the Trust; Conveyance of the Mortgage Pool Assets, REMIC I Regular Interests and
REMIC II Regular Interests; REMIC Election and Designations; Original Issuance of Certificates

Section 2.01.    *Creation of the Trust.*  The Trust is hereby created and shall be known as *"WaMu Mortgage Pass-Through Certificates Series 2005-AR11 Trust"*. The purpose of the Trust is, and the Trust shall have the power and authority, to engage in the following activities, all as provided by and subject to the terms of this Agreement:

(i)    to acquire, hold, lease, manage, administer, control, invest, reinvest, operate and/or transfer the Mortgage Pool Assets, the REMIC II Assets and the Yield Maintenance Agreement;

(ii)    to issue the REMIC I Regular Interests, the REMIC II Regular Interests and the Certificates, the Class R-1 and Class R-2 Residual Interests;

(iii)    to make distributions to the REMIC I Regular Interests, the REMIC II Regular Interests and the Certificates; and

(iv)    to engage in such other activities, including entering into agreements, as are described in or required by the terms of this Agreement or as are necessary, suitable or convenient to accomplish the foregoing or incidental thereto.

Deutsche Bank National Trust Company is hereby appointed as a trustee of the Trust, to have all the rights, duties and obligations of the Trustee with respect to the Trust hereunder, and Deutsche Bank National Trust Company hereby accepts such appointment and the Trust created hereby.  Deutsche Bank Trust Company Delaware, is hereby appointed as a Delaware trustee of the Trust, to have all the rights, duties and obligations of the Delaware Trustee with respect to the Trust hereunder, and Deutsche Bank Trust Company Delaware, hereby accepts such appointment and the Trust created hereby.  It is the intention of the Company, the Servicer, the Trustee and the Delaware Trustee that the Trust constitute a statutory trust under the Statutory Trust Statute, that this Agreement constitute the governing instrument of the Trust, and that this Agreement amend and restate the Original Trust Agreement.  The parties hereto acknowledge and agree that, prior to the execution and delivery hereof, the Delaware Trustee has filed the Certificate of Trust.

The assets of the Trust shall remain in the custody of the Trustee, on behalf of the Trust, and shall be owned by the Trust except as otherwise expressly set forth herein.  Moneys to the credit of the Trust shall be held by the Trustee and invested as provided herein.  All assets received and held in the Trust will not be subject to any right, charge, security interest, lien or claim of any kind in favor of either of Deutsche Bank National Trust Company or Deutsche Bank Trust Company Delaware in its own right, or any Person claiming through it.  Neither the Trustee nor the Delaware Trustee, on behalf of the Trust, shall have the power or authority to transfer, assign, hypothecate, pledge or otherwise dispose of any of the assets of the Trust to any Person, except as permitted herein.  No creditor of a beneficiary of the Trust, of the Trustee, of the Delaware Trustee, of the Servicer or of the Company shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the Trust, except in accordance with the terms of this Agreement.

Section 2.02.    *Restrictions on Activities of the Trust.*  Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Trust, so long as any Certificates are outstanding, the Trust shall not, and none of the Trustee, the Delaware Trustee, the Company or the Servicer shall (except by amendment of this Agreement permitted by Section 10.01) knowingly cause the Trust to, do any of the following:

(i)    engage in any business or activity other than those set forth in Section 2.01;

(ii)    incur or assume any indebtedness except for such indebtedness that may be incurred by the Trust in connection with the execution or performance of this Agreement or any other agreement contemplated hereby;

(iii)    guarantee or otherwise assume liability for the debts of any other party;

(iv)    do any act in contravention of this Agreement or any other agreement contemplated hereby to which the Trust is a party;

(v)    do any act which would make it impossible to carry on the ordinary business of the Trust;

(vi)    confess a judgment against the Trust;

(vii)    possess or assign the assets of the Trust for other than a Trust purpose;

(viii)    cause the Trust to lend any funds to any entity, except as contemplated by this Agreement; or

(ix)    change the purposes and powers of the Trust from those set forth in this Agreement.

Section 2.03.    *Separateness Requirements.*  Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Trust, so long as any Certificates are outstanding, the Trust shall perform the following:

(i)    except as expressly permitted by this Agreement or the Custodial Agreement, maintain its books, records, bank accounts and files separate from those of any other Person;

(ii)    except as expressly permitted by this Agreement, maintain its assets in its own separate name and in such a manner that it is not costly or difficult to segregate, identify, or ascertain such assets;

(iii)    consider the interests of the Trust's creditors in connection with its actions;

(iv)    hold itself out to creditors and the public as a legal entity separate and distinct from any other Person and correct any known misunderstanding regarding its separate identity and refrain from engaging in any activity that compromises the separate legal identity of the Trust;

(v)    prepare and maintain separate records, accounts and financial statements in accordance with generally accepted accounting principles, consistently applied, and susceptible to audit.  To the extent it is included in consolidated financial statements or consolidated tax returns, such financial statements and tax returns will reflect the separateness of the respective entities and indicate that the assets of the Trust will not be available to satisfy the debts of any other Person;

(vi)    allocate and charge fairly and reasonably any overhead shared with any other Person;

(vii)    transact all business with affiliates on an arm's-length basis and pursuant to written, enforceable agreements;

(viii)    conduct business solely in the name of the Trust. In that regard all written and oral communications of the Trust, including, without limitation, letters, invoices, purchase orders and <u>contracts</u>, shall be made solely in the name of the Trust (or the Trustee on behalf of the Trust);

(ix)    maintain a separate office through which its business shall be conducted, provided that such office may be an office of the Trustee, which office shall not be shared with <u>the Company</u> or any affiliates of the Company;

(x)    in the event that services have been or are in the future performed or paid by any Person on behalf of the Trust (other than the Trustee, the Delaware Trustee, the Servicer or the Tax Matters Person as permitted herein), reimburse such Person, as applicable, for the commercially reasonable value of such services or expenses provided or incurred by such Person. Accordingly, (i) the Trust shall reimburse such Person, as applicable, for the commercially reasonable value of such services or expenses provided or incurred by such Person; (ii) to the extent invoices for such services are not allocated and separately billed to the Trust, the amount thereof that was or is to be allocated and separately billed to the Trust was or will be reasonably related to the services provided to the Trust; and (iii) any other allocation of direct, indirect or overhead expenses for items shared between the Trust and any other Person, was or will be, to the extent practicable, allocated on the basis of actual use or value of services rendered or otherwise on a basis reasonably related to actual use or the value of services rendered;

(xi)    except as expressly permitted by this Agreement, not commingle its assets or funds with those of any other Person;

(xii)    except as expressly permitted by this Agreement, not assume, guarantee, or pay the debts or obligations of any other Person;

(xiii)    except as expressly permitted by this Agreement, not pledge its assets for the benefit of any other Person;

(xiv)    not hold out its credit or assets as being available to satisfy the obligations of others;

(xv)    pay its liabilities only out of its funds;

(xvi)    pay the salaries of its own employees, if any; and

(xvii)    cause the agents and other representatives of the Trust, if any, to act at all times with respect to the Trust consistently and in furtherance of the foregoing.

None of the Trustee, the Delaware Trustee, <u>the Company</u> or the Servicer shall (except by amendment of this Agreement permitted by Section 10.01) take any action that is inconsistent with the purposes of the Trust or Section 2.02 or Section 2.03. Neither <u>the Company</u> nor the Servicer shall (except by amendment of this Agreement permitted by Section 10.01) direct the Trustee or the Delaware Trustee to take any action that is inconsistent with the purposes of the Trust or Section 2.02 or Section 2.03.

Section 2.04.        *Conveyance of Mortgage Pool Assets; Security Interest.*

Concurrently with the execution and delivery hereof, the Company does hereby irrevocably sell, transfer, assign, set over and otherwise convey to the Trust, without recourse, all the Company's right, title and interest in and to the Mortgage Pool Assets (such transfer and assignment by <u>the Company</u> to be referred to herein as the "<u>Conveyance</u>").

It is the express intent of the parties hereto that the Conveyance of the Mortgage Pool Assets to the Trust by <u>the Company</u> as provided in this Section 2.04 be, and be construed as, an absolute sale of the Mortgage Pool Assets. It is, further, not the intention of the parties that such Conveyance be deemed the grant of a security interest in the Mortgage Pool Assets by <u>the Company</u> to the Trust to secure a debt or other obligation of the Company. However, in the event that, notwithstanding the intent of the parties, the Mortgage Pool Assets are held to be the property of <u>the Company</u>, or if for any other reason this Agreement is held or deemed to create a security interest in the Mortgage Pool Assets, then:

(a)    this Agreement shall constitute a security agreement;

(b)    the conveyance provided for in this Section 2.04 shall be deemed to be a grant by <u>the Company</u> to the Trust of, and <u>the Company</u> hereby grants to the Trust, to secure all of <u>the Company</u>'s obligations hereunder, a security interest in all of <u>the Company</u>'s right, title, and interest, whether now owned or hereafter acquired, in and to:

(I)    The Mortgage Pool Assets;

(II)    All accounts, chattel paper, deposit accounts, documents, general intangibles, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, and other minerals, consisting of, arising from, or relating to, any of the foregoing; and

(III)    All proceeds of the foregoing.

<u>The Company</u> shall file such financing statements, and <u>the Company</u>, the Servicer and the Trustee acting on behalf of the Trust at the direction of <u>the Company</u> shall, to the extent consistent with this Agreement, take such other actions as may be necessary to ensure that, if this Agreement were found to create a security interest in the Mortgage Pool Assets, such security interest would be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Agreement. In connection herewith, the Trust shall have all of the rights and remedies of a secured party and creditor under the Uniform Commercial Code as in force in the relevant jurisdiction.

In the event that a pleading is filed in a court of competent jurisdiction asserting that this Agreement creates a security interest in the Mortgage Pool Assets, the Trustee on behalf of the Trust shall take actual possession of the Mortgage Pool Assets or, at <u>the Company</u>'s option, the Trustee on behalf of the Trust shall be provided an Opinion of Counsel addressed to the Trust and the Trustee reasonably satisfactory to the Trustee to the effect that such security interest is a perfected security interest of first priority while the Mortgage Pool Assets are in the possession of <u>the Company</u> or its affiliates.

Section 2.05.        *Delivery of Mortgage Files.*

In connection with the sale, transfer and assignment referred to in Section 2.04, <u>the Company</u>, concurrently with the execution and delivery hereof, does deliver to, and deposit with, or cause to be delivered to and deposited with, the Trustee or Custodian the Mortgage Files, which shall at all times be identified in the records of the Trustee or the Custodian, as applicable, as being held by or on behalf of the Trust.

Concurrently with the execution and delivery hereof, the Company shall cause to be filed the UCC assignment or amendment referred to in clause (Y)(vii) of the definition of *"Mortgage File."* In connection with its servicing of Cooperative Loans, the Servicer will use its best efforts to file timely continuation statements, if necessary, with regard to each financing statement and assignment relating to Cooperative Loans.

In instances where the original recorded Mortgage or any intervening assignment thereof (recorded or in recordable form) required to be included in the Mortgage File pursuant to the definition of *"Mortgage File"* relating to a Mortgage Loan is not included in the Mortgage File delivered to the Trustee (or the Custodian) prior to or concurrently with the execution and delivery hereof (due to a delay on the part of the recording office), the Company shall deliver to the Trustee (or the Custodian) a fully legible reproduction (which may be in electronic form) of the original Mortgage or intervening assignment provided that the originator, the related Lender or the escrow or title company which provided closing services in connection with such Mortgage Loan certifies on the face of such reproduction(s) or copy as follows: *"Certified true and correct copy of original which has been transmitted for recordation."* For purposes hereof, transmitted for recordation means having been mailed or otherwise delivered for recordation to the appropriate authority. In all such instances, the Company shall transmit the original recorded Mortgage and any intervening assignments with evidence of recording thereon (or a copy of such original Mortgage or intervening assignment certified by the applicable recording office) (which may be in electronic form) (collectively, "Recording Documents") to the Trustee (or the Custodian) within 270 days after the execution and delivery hereof. In instances where, due to a delay on the part of the recording office where any such Recording Documents have been delivered for recordation, the Recording Documents cannot be delivered to the Trustee within 270 days after execution and delivery hereof, the Company shall deliver to the Trustee within such time period a certificate (a "Company Officer's Certificate") signed by the Chairman of the Board, President, any Vice President or Treasurer of the Company stating the date by which the Company expects to receive such Recording Documents from the applicable recording office. In the event that Recording Documents have still not been received by the Company and delivered to the Trustee (or the Custodian) by the date specified in its previous Company Officer's Certificate delivered to the Trustee, the Company shall deliver to the Trustee by such date an additional Company Officer's Certificate stating a revised date by which the Company expects to receive the applicable Recording Documents. This procedure shall be repeated until the Recording Documents have been received by the Company and delivered to the Trustee (or the Custodian).

For Mortgage Loans for which the Company has received a Payoff after the Cut-Off Date and prior to the date of execution and delivery hereof, the Company, in lieu of delivering the above documents, herewith delivers to the Trustee a certification of a Servicing Officer of the nature set forth in Section 3.10.

Pursuant to the Initial Custodial Agreement, the Initial Custodian has been appointed to act on behalf of the Trust and to perform the functions of the Custodian hereunder with respect to the delivery, receipt, examination, custody and release of the Mortgage Files, as provided therein. In the event that the Initial Custodian is terminated under the Initial Custodial Agreement, the Trustee is authorized, with the Servicer's consent, to appoint any bank or trust company as successor Custodian to perform such custodial responsibilities with respect to the delivery, receipt, examination, custody and release of the Mortgage Files, and to enter into a Custodial Agreement for such purpose. The Trustee shall not be liable for the acts or omissions of the Initial Custodian or any successor Custodian appointed in accordance with this Agreement; *provided, however*, that the Trustee shall remain liable for its own negligent action, its own negligent failure to act and its own willful misconduct to the extent provided herein. Any documents delivered by the Company or the Servicer to the Custodian shall be deemed to have been delivered to the Trustee for all purposes hereunder; and any documents held by the Custodian shall be deemed to be held by the Trustee for all purposes hereunder. There shall be a written Custodial Agreement between the Trustee and each Custodian. Each Custodial Agreement shall contain an acknowledgment by the Custodian that all Mortgage Pool Assets, Mortgage Files, and other documents and property held by it at any time are held by it for the benefit of the Trust.

On or promptly after the Closing Date, the Servicer shall cause the MERS® System to indicate that each MERS Loan, if any, has been assigned to *"Deutsche Bank National Trust Company, as Trustee, without recourse"* or to *"WaMu Mortgage Pass-Through Certificates Series 2005-AR11 Trust, without recourse"* by including in the MERS® System computer files (a) the code necessary to identify the Trustee and (b) the code necessary to identify the series of the Certificates issued in connection with such Mortgage Loans; *provided, however,* that in the event the Company acquired such Mortgage Loans from an affiliate of the Company, then the Servicer need not cause the MERS® System to indicate such assignment. The Servicer shall not alter the codes referenced in this paragraph with respect to any MERS Loan during the term of this Agreement except in connection with an assignment of such MERS Loan or de-registration thereof from the MERS® System in accordance with the terms of this Agreement.

Section 2.06.    *REMIC Election for REMIC I.*

The Servicer, shall, on behalf of REMIC I, elect to treat REMIC I as a REMIC within the meaning of Section 860D of the Code and, if necessary, under applicable state laws. Such election shall be included in the Form 1066 and any appropriate state return to be filed on behalf of REMIC I for its first taxable year.

The Closing Date is hereby designated as the *"startup day"* of REMIC I within the meaning of Section 860G(a)(9) of the Code.

The regular interests (as set forth in the table contained in the Preliminary Statement hereto) relating to REMIC I are hereby designated as *"regular interests"* in REMIC I for purposes of Section 860G(a)(1) of the Code. The Class R-1 Residual Interest is hereby designated as the sole class of *"residual interest"* in REMIC I for purposes of Section 860G(a)(2) of the Code. The REMIC I Regular Interests and the Class R-1 Residual Interest shall together be deemed to be a separate series of beneficial interests in the assets of the Trust consisting of the REMIC I Assets pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

The parties intend that the affairs of REMIC I shall constitute, and that the affairs of REMIC I shall be conducted so as to qualify REMIC I as a REMIC. In furtherance of such intention, the Servicer shall, on behalf of REMIC I: (a) prepare and file, or cause to be prepared and filed, a federal tax return using a calendar year as the taxable year and using an accrual method of accounting for REMIC I when and as required by the REMIC Provisions and other applicable federal income tax laws; (b) make an election, on behalf of the trust, for REMIC I to be treated as a REMIC on the federal tax return of REMIC I for its first taxable year, in accordance with the REMIC Provisions; (c) prepare and forward, or cause to be prepared and forwarded, to the Holders of the REMIC I Regular Interests and the Class R-1 Residual Interest and the Trustee, all information reports as and when required to be provided to them in accordance with the REMIC Provisions, and make available the information necessary for the application of Section 860E(e) of the Code; (d) conduct the affairs of REMIC I at all times that any REMIC I Regular Interests are outstanding so as to maintain the status of REMIC I as a REMIC under the REMIC Provisions; (e) not knowingly or intentionally take any action or omit to take any action that would cause the termination of the REMIC status of REMIC I; and (f) pay the amount of any federal prohibited transaction penalty taxes imposed on REMIC I when and as the same shall be due and payable (but such obligation shall not prevent the Servicer from contesting any such tax in appropriate proceedings and shall not prevent the Servicer from withholding payment of such tax, if permitted by law, pending the outcome of such proceedings); provided, that the Servicer shall be entitled to be indemnified by REMIC I for any such prohibited transaction penalty taxes if the Servicer's failure to exercise reasonable care was not the primary cause of the imposition of such prohibited transaction penalty taxes.

The Company and the Trustee shall promptly provide the Servicer with such information in the possession of the Trustee or the Company, respectively, as the Servicer may from time to time request for the purpose of enabling the Servicer to prepare or cause the preparation of tax returns. If so requested by the Servicer, the Trustee shall sign tax returns on behalf of the REMICs.

In the event that a Mortgage Loan is discovered to have a defect which, had such defect been discovered before the startup day, would have prevented such Mortgage Loan from being a *"qualified mortgage"* within the meaning of Section 860G(a)(3) of the Code, and the Company does not repurchase such Mortgage Loan within 90 days of such date, the Servicer, on behalf of the Trustee, shall within 90 days of the date such defect is discovered sell such Mortgage Loan at such price as the Servicer in its sole discretion, determines to be the greatest price that will result in the purchase thereof within 90 days of such date, unless the Servicer delivers to the Trustee an Opinion of Counsel to the effect that continuing to hold such Mortgage Loan will not adversely affect the status of the electing portion of REMIC I as a REMIC for federal income tax purposes.

In the event that any tax is imposed on *"prohibited transactions"* of REMIC I as defined in Section 860F of the Code and not paid by the Servicer pursuant to clause (f) of the third preceding paragraph, such tax shall be charged against amounts otherwise distributable to the Class R-1 Residual Interest. Notwithstanding anything to the contrary contained herein, the Trustee is hereby authorized to retain from amounts otherwise distributable to the Class R-1 Residual Interest on any Distribution Date sufficient funds to reimburse the Servicer, for the payment of such tax (upon the written request of the Servicer, to the extent reimbursable, and to the extent that the Servicer has not been previously reimbursed therefor).

Neither the Trustee nor the Tax Matters Person shall knowingly or intentionally take any action that would cause the termination of the REMIC status of REMIC I.